**ENGINEERS & FABRICATORS, INC.,**
**Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

No. 23332.

United States Court of Appeals
Fifth Circuit.

April 12, 1967.

John B. Abercrombie, James M. Neel, Houston, Tex., Baker, Botts, Shepherd & Coates, Houston, Tex., of counsel, for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel N. L. R. B., Washington, D. C., James P. Wolf, Houston, Tex., Thomas Canafax, Jr., Atty. N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., for respondent.

Before GEWIN, COLEMAN, and GOLDBERG, Circuit Judges.

COLEMAN, Circuit Judge:

The National Labor Relations Board entered an order requiring Engineers & Fabricators, Inc., to cease and desist certain unfair labor practices, to bargain with the Steelworkers' Union, and to post notices. The company filed a petition for review and the Board cross-petitions for enforcement. The Board's order will be enforced in part and denied in part.

Engineers & Fabricators, Inc., makes "heat exchangers," similar to boilers, at its Houston, Texas, plant. The company was founded in 1938. Efforts to organize its employees began in 1948. Elections were held in 1951, 1953, and 1963. All were won by the company. The 1963 election, held November 7, resulted in a vote of eighty-nine to sixty-two against the United Steel Workers of America, AFL-CIO. Certification of the results was made by the Board November 18, 1963. Before the present proceeding was begun, the company had never been charged with unfair labor practices. There had been no objections to any of the prior elections.

Early in September, 1964, the Steelworkers' Union began its second effort to organize the Efco employees. The last week in that month, Efco's Vice President, Van Alstyne, became aware of the campaign. On Thursday, October 15, Van Alstyne received a letter from the union asserting it represented a majority of Efco's employees; request-

ing recognition; and offering to demonstrate majority status through a card check by a third party or other " * * * feasible manner other than a formal board election after a hearing. * * * " Two days later Van Alstyne received a petition for an election filed by the union with the National Labor Relations Board. Van Alstyne heeded the advice of his attorney that the filing of the petition made any immediate response to the union demand unnecessary. Subsequently, Efco filed a motion to dismiss the petition since it had been filed within twelve months of a prior valid election.

A consent election agreement was completed October 30, 1964. The election was held November 18, exactly twelve months after certification of the 1963 election. Eighty-two votes were cast for the union and eighty-two against it. One vote was challenged by the union and never counted. After the election, the union began the present action by filing election objections and unfair labor practice charges with the National Labor Relations Board.

A complaint issued by General Counsel alleged that on and after October 14, 1964, Efco violated § 8(a) (5) of the N.L.R.A., 29 U.S.C.A. § 158(a) (5), by refusing to bargain. The complaint also alleged violations of § 8(a) (1), 29 U.S. C.A. § 158(a) (1), by certain statements attributed to Van Alstyne and Efco's supervisors.

After a hearing, a Trial Examiner found that through threats, coercive questioning, promotion of an employees' grievance committee, and wage increases, Efco did indeed violate § 8(a) (1). He found further that by signing authorization cards a majority of the Efco employees validly authorized the union to represent them. The Trial Examiner thus concluded Efco's refusal to bargain on and after October 15, 1964, violated §§ 8(a) (1) and 8(a) (5) of the Act. The Examiner's recommended order required Efco to cease and desist its unfair labor

practices, to bargain with the Steelworkers, and to post notices.

As opposed to 109 exceptions filed by Efco, the Board affirmed the Trial Examiner's order and adopted his findings, conclusions and recommendations. Efco's petition for review and the Board's cross-petition for enforcement followed.

I

*Threats, coercion and § 8(a) (1)*

Concerning threats and coercion, we immediately meet the usual conflicts in testimony. Remarks made to employees by Van Alstyne and Efco supervisors during the preelection antiunion campaign were found by the Trial Examiner to be threatening and coercive. By and large to reach the conclusions he did the Trial Examiner credited union witnesses, and discredited those of the company. If the company witnesses had been credited, the statements would largely have constituted permissible prediction and comment. Even by the testimony of union witnesses the remarks were relatively moderate in tone, and to find threats and coercion the Trial Examiner relied on a "fist inside the velvet glove" theory. The remarks affected eight of the 171 employees eligible to vote in the election.

From the record and the Trial Examiner's decision it could well be contended that the election campaign made by the union was less candid and less dignified than that of the company. We also note that the Trial Examiner, in some instances, credited witnesses for General Counsel who undeniably had coerced fellow employees and who then repudiated sworn statements they had filed with the Board. Nevertheless, bearing in mind the Supreme Court's recent definition of the term "substantial evidence",[1] we are unable to conclude there was no substantial evidence that the conversations by Van Alstyne and the Supervisors were coercive and threaten-

---

1. See Illinois Cent. R.R. v. Norfolk & W Ry., 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162, 169 (1966).

ing. As to this feature of the case enforcement will be granted.

As to merit wage increases we have a different matter. For some years Efco had maintained a policy of periodically reviewing each employee's performance and wage structure. Since 1955, it had attempted to make the reviews on May 15 and November 15 of each year. There had been substantial deviations from this schedule. In 1962, reviews were made mainly in February, May, and September. In 1963, they occurred for the most part in April, August, and November, with the November raises going into effect the 21st of that month.

In November 1964, while the union campaign was going on, Efco began processing merit raises. On November 12, six days before the election, a number of raises were announced. It appears that thirty-eight per cent of Efco's employees received these raises, as compared with some thirty-five per cent a year earlier.[2]

The Trial Examiner concluded that since Efco " * * * had no legitimate interest which could not just as well be served by waiting until after the election to announce * * * " the merit raises, it violated § 8(a) (1) by announcing them as it did. Not surprisingly, Efco disagrees with the test which the Trial Examiner employed, contending unilateral raises are only objectionable under the Act if they constitute a "substantial deviation from past practice." In our view, we need not choose between these tests.

■■ "Evidence without a supporting allegation cannot serve as the basis of a determination of an unfair labor practice." Russell-Newman Mfg. Co. v. NLRB, 5 Cir., 1967, 370 F.2d 980; NLRB v. Threads, Inc., 4 Cir., 1962, 308 F.2d 1, 9. The General Counsel's com-

plaint and notice of hearing in this case contains no allegation that Efco violated § 8(a) (1) by granting periodic raises. The Board asserts that allegations in the complaint that Efco supervisors had "promised employees economic and other benefits" sufficed to put Efco on notice. Promising future benefits is quite different, however, from following an already established practice. Nor do we think the fact the merit wage increases had been mentioned among objections to the election, filed with the Board by the union,[3] sufficed to put Efco on notice the merit raises might be the basis of an 8(a) (1) charge found by the Trial Examiner.

■ The Board states on brief that the merit raise issue was fully litigated and understood by all. The record shows that Efco introduced documents showing the merit increases it had granted in the past. Counsel for the General Counsel's office stated, "I don't see the relevance of these documents. This is the basic problem I have in connection with them." We do not accept that as full litigation and understanding.

"The complaint, much like a pleading in a proceeding before a court, is designed to notify the adverse party of the claims that are to be adjudicated so that he may prepare his case, and to set a standard of relevance which shall govern the proceedings at the hearing." Douds v. ILA, 2 Cir., 1957, 241 F.2d 278, 283.

■ It offends elemental concepts of procedural due process to grant enforcement to a finding neither charged in the complaint nor litigated at the hearing. NLRB v. H. E. Fletcher Co., 1 Cir., 1962, 298 F.2d 594, 600. We realize that Labor Board complaints need not " * * conform to the technicalities of common law pleading." See Bakery Wagon Driv-

---

2. By erroneously assuming Efco's 1963 work force was as large as that of 1964, the Trial Examiner concluded only twenty-seven per cent of the 1963 employees had received merit raises.

3. The union's objections are not part of the record, but are contained in an unstipulated appendix to the Board's brief.

ers and Salesmen, Local Union v. NLRB, 1963, 116 U.S.App.D.C. 87, 321 F.2d 353, 356. We do not require such technicality in holding that on these facts the finding of an 8(a) (1) violation regarding merit raises is not entitled to enforcement.

II

*Effect of the card check and § 8(a) (5)*

The persons trying to organize the Efco employees passed out bargaining authorization cards and requested that they be signed. The text of the cards was the following:

"UNITED STEELWORKERS OF AMERICA, AFL-CIO

I hereby request and accept membership in the UNITED STEEL-WORKERS OF AMERICA, and of my own free will hereby authorize the United Steelworkers of America, its agents or representatives, to act for me as a collective bargaining agency in all matters pertaining to rates of pay, wages, hours of employment, or other conditions of employment, and to enter into contracts with my employer covering such matters.

SIGNATURE ..........................................
(Please do not print)

ADDRESS ..................... .....................
Street City

PLANT ...............................................

PAY NO INITIATION FEE OR DUES WITH THIS CARD"

The testimony would reflect that most frequently the signatures were obtained by telling the employee the card was not for union membership but was to obtain an election. By October 14 (the Trial Examiner found), 114 of the 171 employees in the plant had signed these cards. The Trial Examiner concludes that 100 of these employees validly authorized the union to represent them.

The Trial Examiner and the Board rely on Cumberland Shoe Corp., 144 N.L.R.B. 1268 and Aero Corp., 149 N.L.R.B. 1283 (1965) for the rule that if such cards as these are solicited by a statement that they are to be used to get an election, but are later used to prove majority status, there is no misrepresentation. *According to the Board,* it would require a statement that the cards were to be used *only* to get an election to constitute misrepresentation.

This Court has previously shown its impatience with such contentions. In NLRB v. Peterson Bros., Inc., 5 Cir., 1965, 342 F.2d 221, enforcement was denied a bargaining order where an ambiguously-worded card made it *unclear* that signers of cards had intended to apply for union membership.

In Bauer Welding and Metal Fabricators, Inc. v. NLRB, 8 Cir., 1966, 358 F.2d 766, authorization cards were accompanied by a letter stating the cards were for the purpose of obtaining an election. Of the letter, the Court stated,

"We firmly believe the letter was designed for the purpose of, and succeeded in, creating the impression in the minds of the employees that the Union would become the bargaining agent only by winning an election, and that the only purpose in signing the accompanying authorization card was to bring about such an election. ¶¶ Misrepresentation * * * is present herein to the extent that petitioner's employees relied on the letter and be-

lieved that they were only showing a desire to have an election by signing the cards." Id. at 774–775.

The Court in *Bauer* adopted the test set out by the Board in Englewood Lumber Co., 130 N.L.R.B. 394, 395 (1961):

" * * * [W]e do not think it can reasonably be said that the employees, by their act of signing authorizations, thereby *clearly manifested an intention to designate the Union as their bargaining representative.*" *Bauer* at 776 (emphasis added).

In NLRB v. Koehler, 7 Cir., 1964, 328 F.2d 770, 773 the Court declined to enter an extended discussion of individual authorization cards in view of the " * * * overwhelming proof that many employees signed cards because they were promised that such cards were to be used for the purpose of obtaining an election, with a secret ballot, to be conducted by the Board." Enforcement of a bargaining order was denied.

"The decisions of the Board as well as the opinions of the courts place more emphasis upon the representations made to the employees at the time the cards were signed than upon the language set forth in the cards." NLRB v. Winn-Dixie Stores, Inc., 6 Cir., 1965, 341 F.2d 750, 754, cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965).

The Board has the same burdens and obligations as any other litigant who takes the affirmative, and must prove its charge. NLRB v. Riverside Mfg. Co., 5 Cir., 1941, 119 F.2d 302. Therefore, the general counsel had the burden of showing that the cards authorized representation. Cf. Int'l Ladies' Garment Workers' Union v. NLRB, 1960,

108 U.S.App.D.C. 68, 280 F.2d 616, aff'd, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). When cards are challenged because of alleged misrepresentations in their procurement, the general counsel must show that the subjective intent to authorize union representation was not vitiated by such representations. Here the Board did not apply this legal standard. Instead it contends that

" * * * documents timely executed which unequivocally authorize a labor organization to act as the collective-bargaining agent of the signers must be treated as valid bargaining authorizations in the absence of a showing of coercion in their procurement or representations that 'despite the purpose clearly and expressly stated on the cards themselves the cards would be used only for a different more limited purpose'. Aero Corp., 149 NLRB No. 114, 57 LRRM at 1490."

This applies too lax a standard, and therefore the burden was not met. The point is that the Board applied the facts to the wrong legal standard because there was no probing into the subjective intent of the challenged signers.

In our view the foregoing rationale makes it unnecessary to discuss the further points raised by Efco of good faith and the meaning of § 9(c) (3) of the Act, 29 U.S.C.A. § 159(c) (3).

That portion of the Board cease and desist order relating to threats, promising and granting benefits, coercive questioning and promotion of a grievance committee will be enforced, including the posting of notices consistent with this opinion. Enforcement of the remainder of the order is denied.

Enforced in part and denied in part.