**BOYLE'S FAMOUS CORNED BEEF COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 19092.**

United States Court of Appeals Eighth Circuit.

Sept. 3, 1968.

**156**

Clifton L. Elliott and Harry L. Browne of Spencer, Fane, Britt & Browne, Kansas City, Mo., for petitioners.

Nancy M. Sherman, Atty., N. L. R. B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., and Laurence J. Hoffman, Atty., N. L. R. B., on the brief.

Before MEHAFFY, GIBSON and LAY, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

Boyle's Famous Corned Beef Company petitions for review of a decision and order of the National Labor Relations Board dated November 17, 1967 reported at 168 N.L.R.B. No. 46, finding petitioner in violation of the National Labor Relations Act as amended. The Board cross-petitions for enforcement of its order. Jurisdiction is established under § 10(e) and (f) of the Act.

The Board found that Boyle's Famous Corned Beef Company ("Company") violated § 8(a)(2) and (1) of the Act by interfering with and assisting in the formation of the Independent Meat Cutters Union ("Independent") and by con-tributing other support to it. The Board also found the Company violated § 8(a)(5) and (1) of the Act [1] by refusing to bargain collectively with the Amalgamated Meat Cutters & Butcher Workmen of North America, Local Union 576 ("Local 576"), as the recognized bargaining representative of its employees, after the Independent was formed.

The Company is a Missouri corporation with its principal office in Kansas City, Missouri, and is engaged in the processing, distributing, and sale of corned beef and other meat products on a wholesale basis. The Company has about 13 employees, excluding guards, clerical and executive employees. Andrew Schneider is "plant superintendent" with authority to hire and fire employees and is an admitted supervisor. He was a member of Local 576 for more than 25 years prior to the present dispute, his dues being checked off regularly, though he did not attend meetings since becoming superintendent in 1959. Fred Gabriel is "plant foreman" and substituted for Schneider during the latter's vacation in 1966; Gabriel was a member of Local 576 and served as union steward during 1964 or 1965. The remainder of the personnel is employed as beefboners, pumper cry-o-vac operators and unskilled workers. Stephen Ramsey, Boyle's grandnephew, is employed in a non-supervisory capacity and was a member of Local 576. Consistent with the Company's past practice in giving bonuses, Schneider received a bonus of $2,000 in 1966, Gabriel a bonus of $700, Ramsey a bonus of $600, while other employees received a bonus of approximately $100 or less.

---

[1]. As set out in 29 U.S.C. § 158(a) (1), (2) and (5):

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided, That* subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

\*　　\*　　\*　　\*　　\*

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

Since 1951, the Company and Local 576 had entered into successive collective-bargaining agreements. The contracts have been substantially similar to those negotiated during that period between Local 576 and the Heart of America Meat Dealers Association ("Association"), a multi-employer association of wholesale meat companies in the Kansas City area. Although the Company is not a member of the Association, Robert Boyle, the Company's president, serves as president of both the Association and Boyle's Meat Company, (a related but separate company from Boyle's Famous Corned Beef Company) a member of the Association.

The last agreement between the Company and Local 576 was executed August 3, 1964, effective retroactively from June 21, 1964 to June 18, 1966. On June 28, 1966, a strike and lockout involving members of the Association and Local 576 began. The dispute continued until August 17, 1966, when a new contract between Local 576 and the Association was executed. Since the contract between the Company and Local 576 had expired on June 18, 1966, Boyle, as president of the Company, and Carl Nothnagel, spokesman for Local 576, met on or about July 7, 1966, and agreed to an extension of the terms and conditions of the previous contract until after the deadlock in negotiations between Local 576 and the Association ended, at which time negotiation of the Company's contract would resume.

About a month after the strike commenced, Local 576 sought the support of its members employed by the Company in its dispute with the Association at a meeting held in the union hall and requested them to participate in the picketing of Association members, including Boyle's Meat Company. Employee Harold Roberts, then on the executive board of Local 576, noted that all Company employees except Schneider were present. According to employee Kenneth Yardley, because there was talk that Company employees would get into trouble for walking picket, a meeting was held on the Company's premises between Ralph Angle, president of Local 576, and Yardley, Ramsey, Harold Roberts, and employee Millsap, with Angle assuring them they would not get into trouble for walking picket. Employee James Roberts testified that Schneider telephoned him the night Company employees first walked picket and told him that Boyle and Nothnagel had had a meeting and Company employees were not to picket and would be reprimanded for doing so. Roberts called the Local's business agent, Ernest Williams, who said that he had talked to Nothnagel and that they would walk picket. The next morning before working hours, Roberts asked for a meeting with Boyle. With most of the working force assembled, according to Roberts, Boyle "told us that it wasn't our fight, we shouldn't get involved, that he didn't want to injure or cause Corned Beef Company trouble, that we were not on strike and not to be involved in the situation." Yardley stated Boyle "didn't think that we should have to walk because we were putting in a full day at work and he thought if we walked we wouldn't be able to do the work we were doing." The meeting lasted about 10 minutes. Some of the Company's employees honored Local 576's request and picketed at Association member companies.[2]

During the strike or immediately thereafter, the idea of abandoning Local 576 and forming the Independent was discussed by some of the Company's employees. According to Yardley, "It was right after we walked picket," and Steve Ramsey came into the lunchroom and said "If we went Independent Union that Bob

---

2. Although in his decision the Trial Examiner concluded that "Schneider threatened an employee of Respondent with reprimand in the name of the Respondent if he engaged in picketing on behalf of Local 576 in its dispute with the Association," and that "Boyle in a fact confirmed this action the following morning," no independent violation of § 8(a) (1) was either pleaded or proved with regard to the picketing incident.

[Boyle] said we would get a two dollar a week raise over what the union paid." James Roberts first heard of the Independent about three weeks after the strike ended, around the first week in September, from Fred Gabriel and Steve Ramsey. The next day, Roberts spoke to Boyle about being transferred to Boyle's Meat Company, Roberts fearing that he would lose his accumulated pension and vacation rights with the Company if the Independent were formed. Roberts testified "Mr. Boyle said he was unaware that the union was being formed and not to be hasty, to see what the outcome would be." Roberts said he spoke to Gabriel and Ramsey about his concern and was told by them that they had a letter from Mutual of Omaha stating that the Independent would be able to purchase a plan from Mutual covering Roberts' pension rights and that employees would be guaranteed the same rights they had with Local 576, and "Steve Ramsey said Bob would pay this like he paid it to the union." Employees Yardley, Harold Roberts, and Slusser heard Ramsey and Gabriel's assertion.

On or about the first of September, Gabriel told Boyle that some of the employees of the Company were interested in forming their own union. It was stipulated that Boyle told Gabriel "that he could have nothing to do with it and couldn't advise them." Gabriel asked Boyle if he could refer him to an attorney and Boyle said he would check on it. Boyle contacted his own attorney, who advised him to have nothing to do with the formation of the Independent, but did suggest the names of two firms of possible attorneys, which names were given shortly thereafter to Gabriel. One of these firms, Fallon, Guffy and Jenkins —a general practice firm which does some labor work for both unions and management—accepted employment.

On September 21, 1966, Local 576 submitted its contract proposals to the Company. At a meeting on September 28, the Company submitted its counter-proposals. The proposals show that the Company's suggested contract followed the pattern set by the Association settlement, while the Local's suggested contract called for 50 per cent more in wage increases (about $2.40 per week greater than the recently negotiated contract with the Association), an additional holiday, advancement of eligibility for a fourth week of vacation and a one-year, instead of a three-year contract.[3]

No agreement was reached by the parties.

On October 4, 1966, Ramsey informed employees that there would be a meeting in the Company lunchroom at 2:00 p. m.; later Ramsey advised employees that the meeting could not be held during working hours and had been rescheduled for 3:30 p. m. when the workday ended. Ramsey had asked Boyle's permission to have the meeting on Company premises. Boyle disclaimed any knowledge that the meeting concerned the Independent. Boyle said he learned the meeting concerned formation of the Independent after the meeting was in progress when Nothnagel arrived to meet with Boyle for a second round of negotiations on behalf of Local 576. No agreement was reached at this second, and final, meeting between the Company and Local 576.

Meanwhile, Ramsey convened the meeting of the employees, most of whom were in attendance except for Schneider and James Roberts. According to James Jenkins, a member of the Fallon firm, Ramsey told the employees that a group of them had decided that they were "fed up with the treatment they had received from 576," primarily being required to walk picket during the recent dispute between the Association and Local

---

3. The Trial Examiner found that the Company "submitted its counter-proposals which were, as usual, matters already negotiated in the Association's contract;" the Trial Examiner also found that the Local's proposals "to all intents and pur-

poses were those just recently negotiated by the Union in the contract with the Association." The latter finding is erroneous; the Local's proposal called for 50 per cent more in wage increases than the Local-Association contract.

576; other dissatisfactions with Local 576 were mentioned. Ramsey then introduced Mr. Fallon, senior member of the Fallon firm, who explained the advantages and disadvantages of an independent union versus a nationally affiliated union.[4]

Ramsey then asked if there were a sufficient number who wanted to sign. Ramsey, Gabriel and employee Miller were the first to sign the document. Then there was a lull while some employees had discussions as to the feasibility of joining the Independent. Harold Roberts then stated that he was going to get Schneider to see if he would sign the document. While Roberts was getting Schneider, employees Slusser, Grammer and Millsap signed. Roberts returned and signed. Schneider then appeared, added his signature, and immediately left. Employee Glyndon was the ninth and last to sign. The Independent thus had an apparent majority among the Company's employees traditionally included within the bargaining unit.[5] Officers for the Independent were then elected: Slusser, president; Miller, vice-president; Ramsey, secretary-treasurer;

Harold Roberts, Gabriel and Millsap, trustees.

On October 5, a representation petition was filed by the Independent with the Board's Regional Office. By a letter dated October 5, 1966, the Independent requested recognition from the Company. On October 12, Local 576 filed unfair labor practice charges against the Company. The Company did not bargain with Local 576 after the October 4 meeting and discontinued the check-off of dues and the contribution to pension benefits beginning with the payday of October 7,[6] but continued to contribute to a separate health and welfare program. The Company did not act on the Independent's demand for recognition and did not bargain with it.

On November 1, 1966, employee Jack Grammer said he was told by Ramsey that he could have a loan on his "back pay" any time he wanted one. ("Back pay" refers to wages that would be due employees when a new contract with the Company was signed, since such contract whether with the Independent or Local 576 would, in all probability, be effective

4. Fallon made an objective presentation, pointing out that there was a possibility that an employer might pay a higher wage to members of an independent because he felt he was dealing with his own employees and the money he was paying them would not be going to any other union benefits. Fallon also explained the dangers of an independent union if employees couldn't negotiate what they felt was a just wage—other unions would not help by honoring picket lines, and there would be no strike fund or leverage. Fallon noted that it would behoove them to have a majority before they went ahead with the Independent because Local 576 could bring about sanctions, discipline or fine them according to its bylaws. Fallen explained the proposed constitution and bylaws of the Independent and responded to questions.

5. Although recognizing the majority status of the Independent among the Company's employees, the Trial Examiner noted that the constitution of the Independent restricts membership to "every regular employee" and makes ineligible for membership "department heads, supervisors, members of the management staff." The Trial Examiner felt that under such a provision "at least" Schneider and Gabriel would be eliminated from eligibility for membership in the Independent. Accepting the Examiner's interpretation, the Independent would still enjoy majority status.

6. The Trial Examiner found the Company ceased check-off and contribution payments on October 1, four days prior to the actual formation of the Independent. The stipulation of the parties merely indicates the Company checked off dues through September 1966 and discontinued paying pension benefits as of October 1966. The record shows the Local's statement of dues check-off to have been dated October 3, which would have been received by the Company on October 4 or 5 in the normal course of the mail. No deduction could be made by the Company until the next payday which was Friday, October 7, *after* the Independent had demanded recognition.

retroactively from June 19, 1966, and assuming an increase in wages employees would have retroactive "back pay" coming.) Ramsey told Grammer to see either Gabriel or Schneider. Grammer saw Schneider, the loan was approved, and a check was issued on November 4 in the amount of $30. Monty Love, secretary-treasurer of the Company, testified that the practice of the Company with respect to making loans has been the same since the Company started—"any employee that needed the money, we have loaned money." Love made loans to employees other than Grammer in 1966, some of the employees asking to borrow against their "back pay." Love told them all, including Grammer, that he could not loan them money against their retroactive pay "because I didn't know what existed," but approved the loan if the employee needed money. At the time of the hearing, Grammer had not repaid the loan, nor had he been asked to do so, even though Grammer had rejoined Local 576.

On November 28, 1966, nine employees signed cards authorizing the Independent to act as their collective-bargaining agent. Dues for the Independent were collected by Ramsey after working hours. On January 13, 1967, the complaint was issued;[7] and on January 17, 1967, the Regional Director advised the Independent that it would not process its representation petition, asserting that no question of representation existed because of issuance of the complaint. On February 6, 1967, the Independent held its second meeting on the Company's premises during the lunch hour. On that same date,

Ernest Williams, business agent of Local 576, entered the Company's premises to solicit employees to reaffiliate and sign cards with Local 576; Williams displayed the letter from the Regional Director stating the petition of the Independent would not be processed.

A hearing on the complaint was held on February 14 and 20, 1967. On May 15, 1967, the Trial Examiner found that the Company had engaged in unfair labor practices and ordered the Company to bargain with Local 576. The Board affirmed the decision and order of the Trial Examiner, as modified,[8] on November 17, 1967.

The Trial Examiner's conclusions were that during the delay in contract negotiations between Local 576 and the Company, Schneider, Gabriel and Ramsey began efforts to replace Local 576 with an independent union. The three were found to be "considerably more than rank and file employees," because of the bonuses paid them over and above what other employees received, and their respective status (Schneider—superintendent; Gabriel—plant foreman; Ramsey—grandnephew of Boyle). The three were found to speak with the authority of the Company.

Schneider was found to have threatened employee James Roberts with reprimand if he engaged in' picketing on behalf of Local 576, Boyle confirming the action the following morning. Gabriel and Ramsey were found to have enticed employees into abandoning Local 576 and joining the Independent with promises made in Boyle's name, that the employees

---

7. The complaint charged the Company with unfair labor practices as follows:

"Since on or about the dates indicated in 1966 and continuing to date, the Respondent, acting by and through its named agents and representatives, at the plant, has dominated and assisted the Independant by the following acts and conduct:

"(a) Permitting the Independent to hold an organizational meeting on Company property—Robert Boyle, President, October 4.

"(b) Participating in the organization and formation of the Independent —Andrew Schneider, Supervisor, October 4."

8. The Board's decision and order adopted the findings, conclusions and recommendations of the Trial Examiner, modifying the Trial Examiner's decision by finding that the Company's "illegal conduct, * * * constituted assistance only to the Independent and did not reach the level of domination."

would receive $2 per week over union scale from the Independent and would receive the same benefits as they received from the Local. Ramsey was found to have notified employees that the Company would make loans on retroactive "backpay", Schneider confirming one such loan without specific arrangements being made for its repayment.

At least four rank-and-file employees were found to have been induced or coerced to sign the constitution of the Independent upon the representation that Schneider was coming to execute the document himself.

Boyle was found to have assisted the Independent by furnishing the name of an attorney for the purpose of forming an independent union, and by supplying Schneider, Gabriel and Ramsey with the facilities (use of Company premises) for the formation of the Independent as well as for its one subsequent meeting. Boyle was found to have made his "own intention clear" when the Company ceased checking off dues and paying to the pension fund of Local 576, as required by the extended contract, immediately upon formation of the Independent.

The Trial Examiner, after concluding that the above warranted a finding of a § 8(a) (1) and (2) violation, went further and found that the purpose of such violation was demonstrated by the fact that the Company ceased checking off dues and paying to the pension fund, that purpose being a utilization by the Company of the delay in negotiations between the Company and Local 576 to dissipate the acknowledged majority that Local 576 had with employees in order to refuse to negotiate further with Local 576. Hence, the Company was found to have also violated § 8(a) (1) and (5) of the Act, by refusing to bargain with Local 576 as the certified representative of its employees.

At the outset, the Company strenuously argues that the Board violated fundamental rights of due process in finding acts which were not alleged in the complaint or litigated to be violations of the Act or evidence of violations. The complaint (see footnote 7), which was not amended by General Counsel, specifically sets forth two acts, (1) permitting the Independent to hold an organizational meeting on Company property and (2) Schneider, a supervisor, participating in the organization and formation of the Independent. No "catchall" clause is contained in the complaint which could apprise the Company that other acts or conduct not specifically set forth might be alleged and proved to be violations. The record discloses that the Company raised timely objections at the hearing with regard to certain matters on which evidence was offered—acts and conduct not enumerated in the complaint; Gabriel's participation in the Independent, Ramsey's participation in the Independent,[9] and the matter of loans to employees. The facts concerning Boyle's advising Gabriel upon Gabriel's request for the names of attorneys, and the facts concerning the dues check-off and payment to the pension program, were stipulated to by the Company without objection, the Company contending it did so to expedite the hearing, not being aware or advised that such stipulations would be used as independent grounds to support an unfair labor practice charge.

In the brief submitted to the Trial Examiner, General Counsel rested his case upon allegations contained in the complaint, plus the participation of Gabriel and Ramsey to which the Company objected. (The meeting between Boyle and employees concerning picketing during the Association strike was limited to background evidence.) General Counsel did not raise the issues of Gabriel's request for the names of attorneys, loans to

---

**9.** Neither Gabriel nor Ramsey were called by General Counsel. Testimony regarding their participation in the Independent, which testimony was relied upon by

the Trial Examiner in supporting his finding of a § 8(a) (2) violation was derived primarily from employees Yardley, Grammer and James Roberts.

employees, or the discontinuance of dues check-off and pension payments. Thus, even after the hearing, except for the issue of Gabriel's and Ramsey's participation, General Counsel did not suggest that non-alleged acts, relied upon by the Trial Examiner and the Board in finding unlawful assistance, were violations or evidence thereof.

The Board's own rule, 29 C.F.R. § 102.15 provides:

"The complaint shall contain * * * a clear and concise description of the acts which are claimed to constitute unfair labor practices, including, where known, the approximate dates and places of such acts and the names of respondent's agents or other representatives by whom committed."

The Administrative Procedure Act, 5 U.S.C. § 554(b) (3), required that "Persons entitled to notice of an agency hearing shall be timely informed of— * * * the matters of fact and law asserted."

Douds v. International Longshoremen's Association, Independent, 241 F.2d 278, 283 (2 Cir. 1957), discusses the function of the complaint:

"The complaint, much like a pleading in a proceeding before a court, is designed to notify the adverse party of the claims that are to be adjudicated so that he may prepare his case, and to set a standard of relevance which shall govern the proceedings at the hearing."

Both the Company and General Counsel seek support from a recent decision of this Court, Montgomery Ward & Co. v. National Labor Relations Board, 385 F.2d 760, 763–764 (8 Cir. 1967):

"Additionally the Examiner, upheld by the Board, determined Wards to be guilty of a number of § 8(a) (1) violations not charged in the complaint. The complaint charged specific violations and contained no catchall provision. The Board concedes that it attempted to prove additional violations not charged in the complaint and that no attempt was made to amend the complaint. The Administrative Procedure Act, 5 U.S.C.A. § 1004 [now § 554], and the Board's own rule, 29 C.F.R. § 102.15, require that the complaint apprise the parties proceeded against of the violations charged. 'Evidence without a supporting allegation cannot serve as the basis of a determination of an unfair labor practice.' 'It offends elemental concepts of procedural due process to grant enforcement to a finding neither charged in the complaint nor litigated at the hearing.' Engineers & Fabricators, Inc. v. N. L. R. B., 5 Cir., 376 F.2d 482, 485. See N. L. R. B. v. Majestic Weaving Co., 2 Cir., 355 F.2d 854, 861; N. L. R. B. v. Threads, Inc., 4 Cir., 308 F.2d 1, 9–10.

"We recognize that National Labor Relations Board complaints do not have to conform to the technicalities of common law pleadings and that in appropriate situations, issues fairly tried even if not specifically pleaded are to be considered. However, this is not such a case. The additional violations were not referred to in the General Counsel's opening statement. When evidence was first introduced on the non-charged violations, Wards objected on the ground the evidence was not within the scope of the issues pleaded. No attempt was made to amend and Wards, under the record here, cannot be held to have consented to the trial of issues not raised by the complaint."

General Counsel, while admitting "the complaint did not specifically enumerate each and every factor relied upon by the Board in its determination of a violation" and not disputing that "the function of the complaint is to notify the charged party of the claims to be adjudicated so that he may prepare his case", nonetheless asserts that the issues were fairly tried even if not specifically pleaded. The Company was apprised by the complaint of an intention to prove that the Company unlawfully dominated, assisted and interfered with the formation and administration of the

Independent in violation of § 8(a) (2). The Company did not request a continuance to permit further efforts to raise a defense, but chose instead to cross-examine General Counsel's witnesses. By stipulation, and by Boyle's own testimony, Boyle admitted advising Gabriel of attorneys; by stipulation the Company admitted discontinuance of dues check-off and pension fund payments. In its brief to the Trial Examiner and to the Board, the Company presented relevant legal arguments concerning these matters. General Counsel asserts an "appropriate situation" of "issues fairly tried even if not specifically pleaded," *Montgomery Ward,* supra, exists; and that case is not determinative of a different result as applied to the situation in the case at bar, since *Montgomery Ward* involved testimonial evidence by employee witnesses called by General Counsel on the basis of which the Board made findings that particular incidents not referred to in the complaint constitute unfair labor practices *in and of themselves.*

General Counsel points also to the statement of this Court in American Boiler Manufacturers Association v. National Labor Relations Board, 366 F.2d 815, 821 (8 Cir. 1966):

> "Courts as well as the National Labor Relations Board have held that a material issue which has been fairly tried by the parties should be decided by the Board regardless of whether it has been specifically pleaded." (citations omitted)

In *American Boiler,* the complaint alleged a fabrication clause in a collective-bargaining contract was being unlawfully applied by the parties, but the issue of legality of the clause was not passed on by the Board, even though the validity of the clause would be dispositive and was fully litigated by the parties;

this Court remanded to the Board to determine the legality of the clause.

General Counsel also points to National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938) and American Newspaper Publishers Ass'n v. National Labor Relations Board, 193 F.2d 782 (7 Cir. 1951), aff'd 345 U.S. 100, 73 S.Ct. 552, 97 L.Ed. 852. In *Mackay,* "All parties to the proceeding knew from the outset that the thing complained of was discrimination against certain men by reason of their alleged union activities", and "* * * at no time during the hearings was there any misunderstanding as to what was the basis of the Board's complaint." 304 U.S. at 349, 350, 58 S.Ct. at 912. The complaint alleged discriminatory discharge, was amended to assert refusal to re-employ after the hearing, but the Board in its finding reverted to discriminatory discharge. The Court found no violation of due process. In *American Newspaper,* the complaint clearly described the action that was alleged to constitute the unfair labor practice. The Court held that failure to allege which subsection of the Act had been violated or allegation of the wrong subsection does not prevent the Board from considering and deciding the issue, if such failure or mistake does not mislead the charged party.[10]

■ We believe General Counsel's reliance on the applicable law is misplaced. General Counsel's position, if sustained, would not be consonant with administrative due process or fundamental fairness. Patently, General Counsel cannot merely plead a violation of § 8(a) (2) and then proceed to introduce any and all evidence bearing on such violation. Likewise, as in the case at bar, where specific acts violative of the section are enumerated, the proof and subsequent findings should be limited to those matters, absent amendment. Section 10(b) of the Act, 29

---

10. In *American Newspaper,* supra, the Court quoted with approval at 193 F.2d 800:

"'All that is requisite in a valid complaint before the Board is that there be a plain statement of the things claimed to constitute an unfair labor practice that respondent may be put upon his defense. (Citing cases)'"

U.S.C. § 160(b), specifically authorizes the Board to amend the compaint. The complaint sets the standard of relevance. *Douds,* supra. General Counsel's reading of *Montgomery Ward,* supra, in drawing a distinction between non-alleged facts and conduct which are used to prove independent violations as opposed to non-alleged facts and conduct which, in conjunction with alleged facts and conduct, are used to support the finding of a single violation is tenuous and not meaningful. The lack of notice and deprivation of fairness is the same in either situation. Of course, if the non-alleged facts are merely cumulative no prejudice results, but if these non-alleged facts are necessary to support the unfair labor finding, a party can be prejudiced unless, of course, these issues have been fairly and justly tried. Under the Board's liberal rule relating to amendment of the complaint, 29 C.F.R. § 102.17,[11] it would be asking little of General Counsel to follow such a procedure to assure notice and full litigation of the material issues of the case.

Engineers & Fabricators, Inc. v. National Labor Relations Board, 376 F.2d 482 (5 Cir. 1967) presents a comparable situation to the case at bar. The complaint alleged § 8(a) (1) violations by certain statements attributed to respondent's supervisors; the Board found such violations and also found respondent violated § 8(a) (1) by granting certain merit wage increases. Merit wage increases had been mentioned by the union in its charge to the Board; allegations in the complaint noted respondent's supervisors had promised employees economic and other benefits; respondent introduced documents at the hearing showing merit

increases it had granted in the past, which General Counsel deemed irrelevant, but upon which the Trial Examiner relied to find a § 8(a) (1) violation. The Court did not accept the introduction of the documents as "full litigation and understanding" of the issue by respondent. 376 F.2d 485.

In the case at bar, the limited stipulations are no more than the receipt of documents in *Engineers & Fabricators,* supra. The cross-examination of General Counsel's witnesses and the raising of contravening arguments regarding the non-alleged matters in its brief after the hearing is likewise not "full litigation" of the issues by the Company. The Company could have presented contrary evidence at the hearing had it known the non-alleged matters would be relied on by the Board and the case might have been tried quite differently; it is not speculation to deem the Company was prejudiced in this situation due to lack of notice.[12] See, National Labor Relations Board v. H. E. Fletcher Co., 298 F.2d 594, 600–601, f.n. 5 (1 Cir. 1962). As summarized in Engineers & Fabricators, supra, at 485 of 376 F.2d:

"It offends elemental concepts of procedural due process to grant enforcement to a finding neither charged in the complaint nor litigated at the hearing. N. L. R. B. v. H. E. Fletcher Co., 1 Cir., 1962, 298 F.2d 594, 600."

Further, as stated in National Labor Relations Board v. Majestic Weaving Co., 355 F.2d 854, 861 (2 Cir. 1966):

" * * * the time for giving notice of the matters of fact and law asserted is prior to the hearing, not in what the

---

11. "Any such complaint may be amended upon such terms as may be deemed just, prior to the hearing, by the regional director issuing the complaint; at the hearing and until the case has been transferred to the Board pursuant to § 102.45, upon motion, by the trial examiner designated to conduct the hearing; and after the case has been transferred to the Board pursuant to § 102.45, at any time prior to the issuance of an order based thereon, upon motion, by the Board."

12. A statement in the complaint or amended complaint which would have clearly apprised the Company of the acts charged would have had the effect of requiring General Counsel to present more than the paucity of proof tendered at the hearing in support of a § 8(a) (2) violation, and the Trial Examiner would have had to base less of his decision on inference and surmise as discussed more fully below.

Board calls 'General Counsel's post-complaint theory of the case' unveiled in a post-hearing brief."

Without being technical and still espousing a broad and liberal procedure for processing charges into complaints, we think the party charged should be given fair notice of the violations and evidence of violations charged. This was not done in the case at bar. This case could, and probably should, be disposed of on the procedural points raised by the Company and on the failure of the Board to substantiate the charges that were alleged in the complaint, since the Board's finding with respect to the two alleged unlawful acts is not entitled to enforcement as discussed, infra. However, even if we ignore the administrative procedural defects in this case, we do not think there is substantial evidence on the whole record to warrant enforcement.

■■ We realize in viewing the findings and conclusions of the Board, this Court must accept them as binding if based upon substantial evidence on the whole record. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); National Labor Relations Board v. Melrose Processing Co., 351 F.2d 693 (8 Cir. 1965). "Furthermore, in analyzing the evidence, circumstantial or direct, the Board is free to draw any reasonable inferences." Melrose Processing Co., supra, 698. Although a court would justifiably have made a different determination in the case had the matter been before it de novo, it may not displace the Board's choice between two fairly conflicting views. National Labor Relations Board v. United Insurance Co. of America, 390 U.S. 254, 260, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); Universal Camera Corp., supra, 340 U.S. 488, 71 S.Ct. 456. However, as stated in Universal Camera Corp., supra, 488 of 340 U.S., 465 of 71 S.Ct.:

"Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

■■ Furthermore, "The Board's attorney has the burden of proof of violations of section 8 of the National Labor Relations Act * * *." 29 C.F.R. § 101.10(b). See, National Labor Relations Board v. Southern Transport, Inc., 343 F.2d 558, 560 (8 Cir. 1965); Bituminous Material & Supply Co. v. National Labor Relations Board, 281 F.2d 365, 367 (8 Cir. 1960); National Labor Relations Board v. Hunter Engineering Company, 215 F.2d 916, 918 (8 Cir. 1954); and, as this Court has appropriately stated: " * * * [F]ragmentary and unrelated suspicions are not sufficient and 'mere suspicion or conjecture cannot be accepted as substantial evidence' * * *." Bituminous Material, supra, 281 F.2d 367, and cases cited.

■■ The acts charged in the complaint in this case do not constitute violations of § 8(a) (2) under the facts and circumstances presented:

1. Permitting employees to hold a meeting, even an organizational meeting, on company premises on their own time should not constitute a per se violation of the Act. Employees have the right to determine their own representation and to discuss any problems that arise therewith. "In themselves, permission to use company time and premises, and similar acts of co-operation do not constitute such assistance and support as are prohibited by Section 8(a) (2)." National Labor Relations Board v. Magic Slacks, Inc., 314 F.2d 844, 847 (7 Cir. 1963). Even if Boyle had full knowledge of the purpose of the October 4 meeting, as the Trial Examiner found the record shows that Local 576 used the Company premises for union matters unrelated to contract administration—solicitation of new members and assignment of members to picket duty during the Association strike. "An employer must give competing labor organizations equal organizational opportunities." National Labor Relations Board v. Corning Glass Works, 204 F.2d 422,

428, 35 A.L.R.2d 408 (1 Cir. 1953); see, National Labor Relations Board v. Brown Co., 160 F.2d 449, 454 (1 Cir. 1947); 2 CCH Lab.L.Rep. ¶ 3565.07–¶ 3565.08. The Company to be guilty of fostering, aiding or interfering in the organization or administration of the Independent, or any union, must do more than merely allow its employees to utilize its premises for meetings on the employees' own time.[13]

2. A supervisor has the right under § 14(a) of the Act, 29 U.S.C. § 164(a), to belong to a union. This right would necessarily include the privilege of withdrawing from a union or of joining another union. We recognize that the supervisor's actions are of greater significance and have more impact upon employees than the actions of rank-and-file employees, and because of this fact the supervisor's actions are more circumscribed. The supervisor, of course, cannot be used as a tool or instrument of management in fostering or aiding a new union, and strict principles of agency are not required to hold management responsible for the union activity of its supervisory employees. National Labor Relations Board v. Arkansas-Louisiana Gas Company, 333 F.2d 790, 796 (8 Cir. 1964). Yet, to impress the management with responsibility for a supervisor's actions, there must be some connection between the supervisor's actions and management, either by way of instigation, direction, approval or at the very least acquiescence.

Schneider's participation in the formation and administration of the Independent was minimal—he signed the constitution and bylaws at the October 4 meeting. General Counsel relies on four cases: Local 636 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO v. National Labor Relations Board, 109 U.S.App.D.C. 315, 287 F.2d 354 (1961); National Labor Relations Board v. Employing Bricklayers' Association of Delaware Valley and Vicinity, 292 F.2d 627 (3 Cir. 1961); National Labor Relation Board v. Anchorage Businessmen's Association, 289 F.2d 619 (9 Cir. 1961); National Labor Relations Board v. Texas Bolt Company, 313 F.2d 761 (5 Cir. 1963). All are inapposite.

In Local 636, supra, the Court recognized the right of supervisors to be union members but held, "We think that active participation in union affairs by supervisors was aptly characterized as 'interference' by the Board." 361 of 287 F.2d. An examination of the participation by supervisors in the union was shown to include a supervisor holding the office of president, two on the executive board, and two on the election committee. Significantly, with regard to one supervisor who was an active member of the union, the Court remanded to the Board for reconsideration to determine whether his participation, by attending union meetings and voting, was improper in view of his position which was that of general foreman with 40–60 men under him including 6–10 foremen.

In Employing Bricklayers' Association, supra, the Court relied on past Board precedent and the holding in Local 636, supra, that a member of a union " * * * has no statutorily protected right to participate actively in that union", and that " * * * the Board can determine the extent of participation to be permitted in an individual case." Thus, supervisors who were union members in good standing were prohibited from voting for officers and bargaining represen-

13. The Board does not contend, nor do we believe it desirable, to draw a distinction between the situation where workers are unorganized and rival unions seek to represent them and the situation where employees become dissatisfied with the incumbent union and seek to displace the incumbent with an independent union or some other union. In either situation, the duty of management with regard to use of its premises for meeting purposes is the same; one union or group of employees cannot be the recipient of favored treatment. Management must be consistent in its policy. Here neither Local 576 nor the Independent were excluded from utilizing the Company's premises for discussion purposes after working hours.

tatives and otherwise participating in the internal administration of the union.

In *Anchorage Businessmen's Association,* supra, an independent union was formed and incorporated through the efforts of pharmacists who were store managers or assistant managers; the negotiating committee included two managers. There was little evidence "that any rank and file pharmacist played any active role in either the organization or administration of the Independent." The Association by acquiescing in its supervisors' participation in the Independent was found to have interfered with the formation and administration of the Independent.

In *Texas Bolt,* supra, three supervisors were responsible for organizing an independent union which was found to be "company activity."

■ We think the decision and reasoning enunciated in the aforecited cases is sound. The facts of each, however, stand in sharp relief to the facts in the case at bar relied upon by General Counsel to show Schneider's allegedly improper participation in the Independent. Schneider merely signed the constitution and bylaws of the Independent. Schneider did not urge others to join, nor did he ostensibly participate in the formation of the Independent, save for his signing; his only participation in the Independent was to join the organization. This act is not proscribed conduct under the law. The evidence indicates Schneider was carrying out his personal pique at Local 576 over the picketing demand, picketing about which the Company expressed displeasure, but no sanctions were imposed on employees. More must be shown with regard to Schneider's participation to constitute substantial evidence of unlawful activity.

We turn now to examine the Board's findings as to nonalleged acts and background evidence used to support its conclusion that the Company violated § 8(a)(2) of the Act.

■ The finding that the Company through Boyle and Schneider threatened employees with reprimand if they picketed during the Association strike is of little probative value to the issue at hand. The incident does not serve to prove hostility toward Local 576 on the part of the Company in light of the fact that since 1951 the Local had bargained separately with the Association and the Company. The Company's expressed sentiment that "it wasn't our fight" and employees shouldn't get involved would be consistent with the separate bargaining and contract pattern that had been followed by Local 576 for some 15 years. Significantly, no action was taken against Company employees who did picket during the Association strike. While General Counsel points to the fact that the Company's expressed sentiment coincided with one of the reasons advanced by Ramsey for employee dissatisfaction with Local 576, this coincidence does little to strengthen the probative value of the evidence. As background evidence, the incident can only be deemed an extremely weak innuendo that Ramsey and other employees used the incident to foment discontent with the Local among Company employees in accordance with the Company's wishes; on the record the innuendo does not rise to the level of a permissible inference.

■ The finding that Gabriel and Ramsey spoke with the authority of the Company in making promises of benefits to be derived by employees if they joined the Independent and abandoned Local 576 would be decisive if this finding were supported by substantial evidence. The only evidence on this issue is clearly hearsay, not falling within any of the recognized exceptions to the hearsay rule. The exceptions to the hearsay rule are based on trustworthiness and in some instances expediency, none of which is applicable to the present situation. Ramsey and Gabriel were not called as witnesses. Their direct testimony was available and could well have been conclusive on this issue. The burden of proof rests with General Counsel to show the acts of Company employees are attributable to the Company. As stated in Cupples Co. Manufacturers v. National Labor Rela-

tions Board, 106 F.2d 100, 116 (8 Cir. 1939):

"In other words, we think that it was necessary for the Board to prove not only that acts amounting to interference with or domination or support of the independent union were committed, but also that with respect to the commission of such acts the Company virtually stood in the relation of either a principal or an accessory."

We note the amendment to the Act in 1947 adding § 2(13), 29 U.S.C. § 152 (13):

"In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."

The legislative history of § 2(13) indicates that the holding in *Cupples Co. Manufacturers,* supra, remains a correct statement of the applicable law.[14] We do not think this amendment makes management responsible *per se* for any and all acts of employees regardless of the facts of a given situation.

General Counsel's position is that the Act and applicable case law support the Board's finding, and that the Company "acquiesced in the conduct of its representatives" and must bear responsibility. General Counsel relies on National Labor Relations Board v. Link-Belt Company, 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368 (1941); National Labor Relations Board v. Fiore Brothers Oil Company, 317 F.2d 710 (2 Cir. 1963); and International Association of Machinists, Tool and Die Makers Lodge No. 35, etc. v. National Labor Relations Board, 311 U.S. 72 (1940)

where it is stated at 80 of 311 U.S., 61 S.Ct. 83, 88, 85 L.Ed. 50:

"Thus, where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates. Here there was ample evidence to support that inference."

In *International Association of Machinists,* four non-supervisory employees "were in a strategic position to translate to their subordinates the policies and desires of the management" which amounted to "great hostility" to the non-assisted union. Solicitation for the assisted union was openly done on company time in the presence of a company foreman who was aware of representations made in his name that those who did not sign with the assisted union would be discharged; the company discharged officials of the competing non-assisted union. The superintendent and one of the employees told other employees that the company would not recognize the non-assisted union.

In *Link-Belt Company,* supra, the employer manifested a hostile attitude toward an "outside" union, and employees were discharged for activities in behalf of the "outside" union. Employee representatives, as well as supervisors, actively solicited for an independent union on company time. Employees were threatened with discharge if they did not "sign up" and the names of some illiterate employees were signed without their consent.

14. In considering the enactment of § 2(13), the Committee of Conference, House Report No. 510, 80th Cong., 1st Sess. (1947), U.S. Code Cong. Service, p. 1142, reported:

"The conference agreement contains in the definition section a rule to be applied for the purpose of determining when a person is acting as an 'agent' of another person so as to make such other person responsible for his acts. * * * [U]nder the conference agreement, as under the House bill, both employers and labor organizations will be responsible for the acts of their agents in accordance with the ordinary common law rules of agency (and only ordinary evidence will be required to establish the agent's authority)."

In *Fiore Brothers Oil Company,* supra, a non-supervisory employee, son-in-law of the company president, solicited authorization cards for the assisted union during working time, a supervisor arranging a meeting with an employee to facilitate solicitation. Benefits promised from membership with the assisted union were the same benefits that were set forth in the contract and agreed to by the company.

The facts in the case at bar are not analogous to the cases cited above and point to a different conclusion. The Company's preference for an independent union was at no time manifested. No employees were discharged for activities in behalf of Local 576. Support for the Independent was not solicited during working time. Gabriel, although listed as "plant foreman," was not shown to be a supervisor; his participation in the Independent was limited to a request made of Boyle for attorneys' names and the discussion that Gabriel and Ramsey had with James Roberts about pension benefits. The record shows nothing for which the Company is accountable vis-a-vis its employees through the conduct of Gabriel.

Ramsey, a non-supervisory employee, was found to have made representations in Boyle's name of benefits that would accrue if the Independent were formed. The Trial Examiner found that Ramsey spoke with authority of the Company because he is Boyle's grandnephew and receives a greater bonus than other non-supervisory personnel. Such a scant basis for imputation is not sufficient standing alone.[15]

There is no direct evidence that the Company was aware of Ramsey's or Gabriel's activities or remarks bearing on promised benefits. The only evidence in the record regarding the Company's knowledge is Boyle's testimony that the day of the hearing was the first time he had heard of any offer made in his name that employees of the Company would receive a $2 per week increase over and above the wage scale the Local had negotiated with the Association. While the Trial Examiner chose to discredit Boyle's testimony by concluding that Boyle did not testify truthfully at the hearing, such "negative evidence" can hardly be deemed substantial evidence on the record. The imputation that Ramsey or Gabriel spoke with authority of the Company rests on the hearsay testimony of Yardley, Grammer and James Roberts. The employees did not even testify to the fact that they believed Ramsey or Gabriel were speaking for the Company, or that they thought what was said was approved or acquiesced in by the Company.[16] While hearsay evidence can be used in administrative hearings and may be of some probative value, when the reception of such is not inconsistent with the admissibility of evidence under the Administrative Procedure Act, 5 U.S.C. § 556(d), we believe that it was incumbent on General Counsel to make a more substantial showing in this case to establish the imputation sought to be proved by the hearsay. This could have been accomplished by calling Ramsey and Gabriel; their testimony might have afforded the Trial Examiner a much stronger basis for making his conclusions. "Substantial evidence"

15. The record also shows that Boyle was on a first-name basis with all of the employees of the Company. The Trial Examiner found that Ramsey's proportionally large bonus was paid "for some unstated reason." No attempt was made by General Counsel to develop the point.

16. The conversation Gabriel and Ramsey had with James Roberts, telling him that his pension rights would be guaranteed under a private plan and "Steve Ramsey said Bob [Boyle] would pay this like he paid it to the union," shows neither a promise of a benefit, nor a promise from the Company that could reasonably lead Roberts to believe Gabriel or Ramsey were acting for the Company. (The Company paid into Local 576's pension plan, and employees would undoubtedly look to the Company for a similar contribution if an independent union were formed.) The Trial Examiner found that Roberts was "apparently unimpressed by this promise" and sought out Boyle the next day to ask for a transfer; apparently Roberts did not regard Ramsey or Gabriel as speaking with the authority of the Company.

includes more than "uncorroborated hearsay" and "more than a mere scintilla." Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229–230, 59 S.Ct. 206, 83 L.Ed. 126 (1938). " * * * [T]he findings, to be valid, cannot be based upon hearsay alone, nor upon hearsay corroborated by a mere scintilla." Willapoint Oysters v. Ewing, 174 F.2d 676, 691 (9 Cir. 1949).

 Ramsey's telling Grammer that he could get a loan on his "back pay" does not add up to an unfair labor practice. The communication took place after Company employees had worked about three months without a contract. The 1964 Local 576-Company agreement provided for retroactive pay. The 1966 Local 576-Association contract provided for retroactive pay. Both the Company's proposal and the Local's proposal provided for retroactive pay. (A contract between the Independent and the Company would probably provide for retroactive pay, although that is not known since no negotiations between the Independent and the Company took place.) Employees would justifiably be anticipating "extra money" in their pockets after a contract was signed, be it with Local 576 or the Independent. There is absolutely no evidence that Grammer was told by Ramsey, Schneider (who merely said Grammer could get a loan) or Love that he could receive the loan on the basis of promised wage increases that would be granted to the Independent but not to Local 576. Further, the uncontroverted testimony of Love was that Grammer was granted his loan, not on the basis of retroactive "backpay" from any source, but because of the Company's long-standing policy to grant loans to employees.

 Boyle's alleged unlawful assistance is purportedly shown by suggesting the names of two attorneys to assist in formation of the Independent. The record shows that Boyle expressly disaffirmed any intention to have anything to do with the Independent when Gabriel informed him of the desire of some employees to form their own union. Gabriel then asked Boyle if he could give him the names of attorneys, after Boyle discussed the matter with his own attorney. There is no evidence that the attorneys suggested were in any way connected or associated with the Company or Company's counsel.

At the hearing, the Trial Examiner's questioning of counsel retained by the Independent revealed that the firm is a general practice firm that handles labor problems on "both sides of the fence." The uncontroverted version of counsel's participation in the October 4 meeting shows an unbiased presentation of arguments both for and against the Company employees forming the Independent. Under the circumstances of this case, the Company was not guilty of an unfair labor practice. See *Cupples Co. Manufacturers,* supra, 108 of 106 F.2d.[17]

General Counsel points to the request of James Roberts for a transfer to Boyle's Association affiliated company on learning of plans to form an independent union. Roberts testified as to Boyle's reply to his request: "Mr. Boyle said he was unaware that the union was being formed and not to be hasty, to see what the outcome would be." General Counsel argues that this shows "Boyle both tacitly conceded his expectation that the Company would soon execute a contract with the Independent which might afford as much protection to Roberts' seniority as Heart of America's [the Association's] contract with Local 576, and gave Roberts an incentive for promoting this result." Again, General Counsel reaches; speculation does not equate with a reasonable inference based on the evidence. Unless

---

17. But see, 2 CCH Lab.L.Rep. ¶ 3540: "Aid in drafting contracts, suggestion of attorney, and presence of management representatives at meetings are all evidences of aid in formation of a company union." The cases cited at ¶ 3540.56– ¶ 3540.605 suggest that more than a mere suggestion of attorneys' names upon request is needed before such conduct will rise to the level of an unfair labor practice.

one accepts General Counsel's theory, which is supported only by a juxtaposition of isolated incidents and conjecture, that a "conspiracy" between Boyle, Schneider, Gabriel and Ramsey existed to oust Local 576, the conversation between Roberts and Boyle is innocuous insofar as showing any improper conduct on the latter's part. If Boyle intended to assist the Independent and "dissipate the acknowledged majority which Local 576 enjoyed among employees," as found by the Trial Examiner, Boyle could have used the opportunity afforded by Roberts to effectuate that end by simply granting the transfer and ridding the unit of a long-time Local 576 adherent. The language of Judge Sanborn in *Cupples Co. Manufacturers*, supra, at p. 114 of 106 F.2d is appropriate:

" * * * [W]hile such evidence is consistent with the hypothesis that the formation and administration of the independent union was interfered with, dominated and supported by the Company, it is not inconsistent with the contrary hypothesis, and therefore supports neither." (Citations omitted)

While the Trial Examiner concluded that Boyle made his "own intention clear" when the Company ceased dues check-off and pension fund payments as required by the oral extension of the provisions of the expired Local 576-Company contract,[18] the Company contends that once the Independent made request for recognition, followed by the filing of a petition, a real question of representation was raised and that it was incumbent upon the Company to maintain a position of neutrality.

Under the holding of Midwest Piping and Supply Co., Inc., 63 N.L.R.B. 1060 (1945), an employer faced with conflicting claims of representation by rival unions must maintain a position of absolute neutrality, and cannot manifest conduct which accords unwarranted prestige to one of the rival unions, or encourages or discourages membership therein without violating § 8(a) (2) of the Act.

In Guy's Foods, Inc., 158 N.L.R.B. 936, 947 f.n. 37 (1966), the Board held that checking off dues to the incumbent union constituted unlawful assistance under *Midwest Piping*, supra, during a time when the outside union had petitioned for representation. Accord, Stainless Steel Products, Incorporated, 157 N.L.R.B. 232, 257 (1966).

The record before us compels the conclusion that the Company's "intention" was to remain aloof from the organizational activities of its employees. Prior to the Independent's demand for recognition, the Company demonstrated a willingness to enter into a contract on terms which had traditionally formed the basis of agreement between Local 576 and the Company—the Association settlement: by entering into an agreement at that time with Local 576, any subsequent question of representation raised by the Independent would have been legally barred.

After the Independent's demand for recognition and filing of a petition, the Company ceased check-off and pension fund payments. Under the circumstances here presented, this action preserved the neutral posture of the Company. The Company did not afterward take any action to recognize the Independent or bargain with it as the representative of its employees. The record is devoid of any activity on the part of the Company that could justifiably be found to constitute assistance to, interference with, or support of the Independent.

We find the Board's order not entitled to enforcement as substantial evidence on the whole record does not support a finding that the Company violated § 8(a) (2) and (1) of the Act. The Board's finding that the Company engaged in the above charged unfair labor practices in order to

---

18. It is not contended that the agreed to extension was a formal collective-bargaining agreement such as to preclude the Independent's request for representation under the "contract-bar rule." See, 2 CCH Lab.L.Rep. ¶ 2730, et seq.

refuse to engage in collective bargaining with the Local in violation of § 8(a) (5) and (1) of the Act is dependent on the alleged § 8(a) (2) and (1) violation and must be denied enforcement.