**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BLAKE CONSTRUCTION CO., INC., and its Alter Ego, M & S Building Supplies, Inc., Respondent.**

**No. 80–1922.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 12, 1981.

Decided Aug. 17, 1981.

Lawrence E. Blatnik, Atty., N. L. R. B., Washington, D. C., with whom Elliott Moore, Deputy Associate Gen. Counsel, Paul J. Spielberg, Deputy Asst. Gen. Counsel, Washington, D. C., were on the brief for petitioner. Shelly S. Korch, also entered an appearance for petitioner.

Willis J. Goldsmith, Washington, D. C., with whom Deborah Crandall and Marc A. Silverstein, Washington, D. C., were on the brief for respondents.

Before McGOWAN, WILKEY and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The National Labor Relations Board (the Board) seeks enforcement of its Order[1] against Blake Construction Co., Inc., and M & S Building Supplies, Inc. (referred to individually as Blake and M & S, and collectively as the Company). We grant the application except for paragraphs 1(c), 2(b) and 2(d) of the order insofar as they are premised on the Company's violation of sections 8(a)(1) and (5) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq. (the Act) through failure to extend to its non-union employees the benefits of an existing collective bargaining agreement and through refusal to deal with the Union as the representative of these non-union employees. As explained more fully below we decline to enforce these portions of the order because we find that these violations were neither alleged in the complaint issued by the Board General Counsel nor fully and fairly litigated in the ensuing proceedings.

## I. BACKGROUND

The record depicts grave violations of the Act which, with the exception discussed below, the Company concedes on this appeal. The following facts are undisputed.

Blake, a District of Columbia corporation, is a general contractor engaged in the construction of buildings. Blake owned and operated a yard and warehouse located at 5700 Columbia Park Road, Landover, Maryland until February 1978.

M & S is also a District of Columbia corporation established in 1974 to purchase and resell construction materials, equipment and supplies. M & S and Blake have the same corporate headquarters at 1120 Connecticut Avenue, N.W., the same principal stockholders and the same corporate officers. Prior to February 1978 M & S sold building materials and provided a tire fill service at a warehouse located at 5710 Columbia Park Road, Landover, Maryland immediately adjacent to the Blake yard and warehouse described above.

Blake was a member of the Construction Contractor's Council, Inc. (3–C's), a multi-employer bargaining unit. As such Blake was subject to a collective bargaining agreement (the contract) entered into by the 3–C's and Local 639 of the International Brotherhood of Teamsters (the Union) which was in effect from August 1, 1975 to April 30, 1978.

[1]. 245 NLRB No. 76 (Sept. 28, 1979), the Board's order also appears at J.A. 17–22 ("J.A. _____" refers to pages in the Joint Appendix filed in conjunction with this appeal).

In July 1977 a Blake employee called the Union and complained that although not a Union member, as an employee of Blake he should be covered by the contract and receive the prevailing wages provided therein.[2] At this time only seven out of a fluctuating work force of 40–70 Blake employees belonged to the Union.[3] In response to this call a Union representative [4] visited Blake's Columbia Park yard and warehouse. There he spoke to between eight and ten employees who were not members of the Union. Since these non-union employees performed work that fell within the job classifications covered by the contract, and in light of the fact that the contract contained a Union security clause,[5] the Union representative attempted unsuccessfully to ascertain from a supervisor at Blake why the Union security provision had not been enforced.[6]

On August 31, 1977 the Union official met again with the Blake supervisor at the Columbia Park site in the presence of two employees who had applied for Union membership and had paid the Union initiation fee. At this meeting the Union requested that the two employees be paid the wage specified in the contract. The Company refused but indicated it would be willing to negotiate a separate contract for these two men.

Subsequently the Union shop steward actively solicited for Union memberships among Blake employees and obtained approximately thirty-two signed Union authorization cards. The Union then sought to have the Company pay these recruits the prevailing contract rate. The Company refused.

On February 17, 1978, Blake and M & S entered into a contract providing that, as of February 18, 1978, M & S—which previously had only one part-time employee—would thereafter furnish all personnel for the operation of Blake's Columbia Park Road business and for the operation of all Blake

---

**2.** Article Sixteen of the contract provided specific wage rates for the following job classifications:

Boom Trucks
Small Dump Trucks
Water Sprinklers
Grease and Oil Trucks
Dump Trucks Over Eight Wheels
Flat Trucks
Trailers
Low Boys
Tractor Pulls
Warehousemen Job Site
Pickups Hauling Materials
Helpers
Carryalls
Large Euclids
Small Euclids
Euclid Water Sprinklers
Tunnel Work Underground
Mechanics
Mechanics Limited
Greasers
Tiremen
Stockroom Men
Runners
Pay Haulers

GCX 3, at 23–25. ("GCX _____" refers to the General Counsel's exhibits).

**3.** Blake considered the contract binding only as to these seven employees and maintains that the Union shared Blake's interpretation of the contract. Given our resolution of this case it is unnecessary for us to determine either the ac-

curacy of this assertion or its potential legal significance. However, by way of background it is noteworthy that the Union did not show an active interest in Blake's non-union employees until mid-1977 when a new slate of Union officers was elected. The Union contends, nevertheless, that the contract applied to all of Blake's employees and that it did not waive its right to represent them.

**4.** The newly elected vice-president and business agent of the Union investigated the complaint.

**5.** Article One of the contract stated that all employees covered by the contract were to become members of the Union within thirty-one days after their employment and were to retain their membership during the period of contract coverage. GCX–3 at 3–4. Article One also obligated the Company, upon written notice from the Union, to discharge any employee covered by the contract who failed to become a Union member. *Id.*

**6.** At no time prior to mid-1977 did the Union enforce this Union security provision by demanding discharge of an employee for not joining the Union. Nor did the Union press any grievances on behalf of any non-union employee of Blake or request that Blake pay the contract wages to any employee who had not either joined the Union or signed a Union membership application.

trucks transporting materials and supplies.[7] Pursuant to this contract Company representatives informed Blake's Columbia Park Road employees that Blake was no longer in the trucking and warehousing business, but that instead M & S would now engage in these activities. The employees were also informed that Blake was laying them off, but that M & S was simultaneously offering them jobs, beginning on February 20, 1978, the following Monday. Each Blake employee would be required to sign a new employment application and a new W–4 form.

At a meeting on February 17, 1980, work applications for M & S were distributed to and signed by Blake's non-union employees. At M & S these employees received the same rates of pay they had been paid by Blake.

At a separate meeting that day the six Union employees then working at Blake[8] were told that their wages at M & S would be lower than their current rate of pay under the contract. The shop steward promptly reported the layoff and new terms of employment offered by M & S to the Union. On the following work day, a Union representative visited Company representatives at the Columbia Park Road site. The Company confirmed at that time that it would no longer honor the contract. When the Union representative tried to learn the new rate of pay for Union employees he was told that it was none of his business and that the Company would henceforth be dealing with the Union employees on an individual basis.

A Company representative then met individually with the six Union employees and negotiated their rate of pay at M & S.[9] These rates varied with the individual but in all cases the wages were substantially less than those received at Blake under the contract.[10] One of the six employees, the Union shop steward, refused to work at a reduced rate of pay and left the Company.[11]

Following the transfer of Blake's operations to M & S, employees performed the same functions at the same work site as they always had. They punched the same time clock, worked the same hours, and received their work instructions from the same supervisory staff. For example, the

---

7. GCX–9. The contract required Blake to reimburse M & S on a weekly basis for the costs of providing these services and to pay M & S a monthly fee of 10 percent of these expenditures. *Id.*

8. At this time only six of Blake's employees, all truck drivers, were members of the Union and paid wages specified in the contract. A seventh Union member left Blake on January 12, 1978 and is not involved in this appeal.

9. The tone of these "negotiations" is suggested by one employee's unrefuted account of his meeting with the Company representative, the details of which were corroborated by the Company representative. Tr. 112. ("Tr. _____ refers to the transcript of the hearing held before the ALJ.) According to this employee, who was then making $8.50/hour, the Company representative said:
   I'm saving you till last. . . . I ain't going to mess around with you. I'm going to tell you what I got. . . . I got six dollars and a quarter with insurance and a week's vacation. I got six dollars and seventy-five cents with nothing.
Tr. 425. The employee replied "No, I can't go with that" and quit. *Id.*

10. The first Union employee to meet with the Company representative had been a Blake employee since 1961. At Blake he earned $8.30/hour when he drove a stake bed truck and $8.50/hour when he drove a tractor-trailer. He initially refused an offer of $6.25/hour but accepted an offer of $7.00/hour. The second Union employee had been with Blake since 1962. Although he was earning $8.50/hour he was offered $7.00/hour without benefits or $6.25/hour "with everything" which included benefits such as hospitalization, one day off and a week vacation pay. He accepted the $6.25/hour with benefits. The third Union employee had been with Blake since 1967. His wages varied between $8.30/hour and $8.50/hour. He was initially offered $6.50/hour which he refused. When offered $6.75/hour without benefits and $6.25/hour with benefits he accepted the former. The fourth Union employee who had worked with Blake since 1970 earned $7.50/hour and was offered $6.25/hour with benefits and $6.75/hour without. He accepted the offer of $6.75/hour. The fifth and last Union employee to accept the lower wages accepted an offer of $5.00/hour with benefits. The record does not show his prior wage rate.

11. *See* note 9 *supra.*

former yard superintendent at Blake became the warehouse manager of M & S. He testified that in his new capacity he did essentially what he had always done, namely supervise "the organization of the warehouse, and the distribution of the material, equipment, and supplies kept at the Landover yard location." Tr. 78. The employees continued to drive trucks with "Blake" insignia on them to the same building sites. The telephone and mail service at M & S remained the same as at Blake. The operations of both M & S and Blake continued to be supervised from the joint headquarters of both companies at 1120 Connecticut Avenue. In sum, as the Company states,

> from the viewpoint of M & S's employees, the ownership, management, business purpose, operation, equipment, customers, and supervision of M & S after February 20, 1978 was substantially identical to Blake's prior to that date . . . except for the absence of [the] shop steward . . . and the lower wages of the other five

union employees, there was little if any, change between the employment conditions existing prior to February 17 and those prevailing February 20 and thereafter.[12]

The Union filed charges against the Company[13] and the Board General Counsel issued a complaint.[14] The complaint alleged that the Company discriminated against seven named Union members and that the events of February 17 and 20, 1978 were in violation of sections 8(a)(1), (3), and (5) of the Act.[15] However, the parties agree that the complaint, unlike the Union's original charge, did not include a specific allegation that the Company violated sections 8(a)(1) and (5) of the Act by failing to apply its contract with the Union to *all* employees in the contractual unit or by failing to recognize and bargain with the Union as the representative of *all* of the employees in the unit, other than the seven named Union employees.[16]

---

**12.** Company's Brief at 8 *quoting in part* the Administrative Law Judge's Decision at 6, J.A. at 6 (June 8, 1979).

**13.** The Union filed a charge against Blake on January 19, 1978, GCX–1–A, before the transfer of operations from Blake to M & S. This charge alleged that Blake had violated sections 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1) and (5) on or about August 1, 1977, and continuing since that date, by unilaterally changing the terms of the contract and refusing to pay the contract rate to its employees represented by the Union and by refusing to bargain with the Union about such matters.

After the transfer of operations the Union amended the charge on February 27, 1978. GCX–1–C. The amended charge reiterated the allegation of the original charge and added an allegation that on or about February 17, 1978 Blake had "terminated the employment of all of its employees because of their membership in and activities on behalf of the Union."

On March 14, 1978 the Union filed a second amended charge. GCX–1–E. This charge added M & S as a charged party but was otherwise identical to the first amended charge.

**14.** GCX–1–G. The complaint issued on March 30, 1978.

**15.** 29 U.S.C. §§ 158(a)(1), (3), and (5) which provide in pertinent part:

§ 8(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7

. . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization

. . . .

. . . .

(5) to refuse to bargain collectively with the representative of his employees. . . .

Section 7 of the Act, to which section 8(a)(1) refers, provides that:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities. . . .

29 U.S.C. § 157.

**16.** Board's Reply Brief at 2; Company's Brief at 9–10, 14–19. The allegation of the Union's January 19, 1978 charge, *see* note 13 *supra*, did not become part of the complaint. The complaint does, however, allege that the Company violated sections 8(a)(1) and (5):

Since on or about February 17, 1978 [the Company] has failed and refused and continues to fail and refuse to bargain in good faith

Following a hearing, an Administrative Law Judge ("ALJ") ruled that Blake and M & S were *alter egos* and that both comprised a single employer.[17] The ALJ also determined that the Union "has been and is now the exclusive bargaining representative of all employees of Blake and/or M & S whose jobs are enumerated in the contract...."[18] The ALJ concluded: that the Company violated section 8(a)(1) of the Act by imposing conditions upon all employees, *i. e.*, a requirement to complete new employment applications, because of the Union's demand that Respondent honor the terms of the contract with respect to all employees;[19] that the Company violated sections 8(a)(3) and (1) of the Act by constructively discharging the Union shop steward and by laying off and rehiring at reduced pay the five other employees who were Union members; and that the Company violated sections 8(a)(5) and (1) of the Act by failing and refusing to honor the terms of the contract, by transferring unit work from Blake to M & S, without consultation with the Union, by unilaterally negotiating with, and by reducing the wages of unit employees in violation of the contract, and by failing to give notice to and bargain with the Union about Blake's plan to go out of business and to lay off its employees.

The Board affirmed the ALJ's decision and issued his recommended order with one modification.[20] The Board's order required the Company to cease and desist from the unfair labor practices found by the ALJ, including as specified in paragraph 1(c) "[r]efusing to recognize and bargain with the Union as the exclusive representative of its employees in an appropriate unit consisting of [the job classifications enumerated in the contract]."[21] Paragraph 1(e) further required the Company to cease and desist from "[i]n any other manner" interfering, restraining, or coercing its employees in the exercise of their rights under section 7 of the Act. (emphasis supplied).

The affirmative relief ordered by the Board required the Company to remedy the harms suffered by the six Union member employees. In addition, paragraph 2(b) required the Company to recognize and bargain with the Union as the exclusive representative of all the employees who are in the unit consisting of the job classifications specified in the contract. . Paragraph 2(d) required the Company to apply the contract retroactively to the employees of Blake and M & S and make them whole for any losses suffered as a result of the failure to apply the contract to them.

The present application for enforcement of the Board's order followed.

## II. ANALYSIS

The Company concedes that there is substantial evidence in the record to prove that M & S is an *alter ego* of Blake, and that the Company's actions of February 17 and 20,

---

with the Union and has instead engaged in a course of conduct designed to undermine the representative status of the Union by [certain specified acts].
GCX–1–G, at 4, paragraphs 10 & 11.

**17.** ALJ's Decision at 9–10, J.A. at 9–10 (June 28, 1979).

**18.** *Id.* at 10–11, J.A. at 10–11. *See* note 2 *supra.*

**19.** The Complaint also alleged that certain conversations between Company supervisors and employees "in or about January 1978" [sic] violated section 8(a)(1). GCX–1–G at 3, paragraph 7(a) & (b). The ALJ dismissed these allegations for lack of evidence. J.A. at 10. At several points in the ALJ's decision and the Board's Order the language is ambiguous as to whether it refers only to the six union employees, only the non-union employees, or both the union and non-union employees. The present controversy concerns the application of the ALJ's findings and remedies to non-union employees.

**20.** Note 1 *supra.* Because the ALJ failed to include a unit description in his recommended order, referring therein only to the "appropriate unit," the Board modified paragraphs 1(c) and 2(b) of the ALJ's recommended order to make it clear that those portions of the order applied to all employees working for the Company within the job classifications listed in the contract, *see* note 2 *supra.* *Id.* at 3 n.4, J.A. at 19 n.4. In all other respects the Board affirmed the ALJ's decision.

**21.** Note 2 *supra.*

1978 constituted an unlawful unilateral change in the working conditions of the six Union member employees.[22] The Company opposes enforcement of paragraphs 1(c), 2(b) and 2(d) of the Board's order, described above, because it contends they are based on violations of the Act which were neither alleged in the General Counsel's complaint nor litigated before the ALJ. The Company also objects to the broad language of paragraph 1(e) which prohibits violations "in any other manner" as improperly subjecting it to contempt for *any* subsequent infringement of employees' rights under section 7 of the Act.

### A. Paragraphs 1(c), 2(b) & 2(d) of the Board's Order

### 1. The Due Process Issue

The Company contests the propriety of the finding that it violated sections 8(a)(1) and (5) of the Act by refusing to apply the terms of the contract to all of its employees in the unit or to recognize the Union as the representative of all of those employees. Its main assertion is that it was denied due process since such violations were neither alleged in the complaint nor litigated at the hearing. Since we agree with that contention, we do not reach the Company's alternative argument that the challenged findings are not supported by substantial evidence.

■ The applicable law is clearcut. Both the Administrative Procedure Act[23] and the Board's own rules[24] require that the complaint inform the Company of the violations asserted. The Board may not make findings or order remedies on violations not charged in the General Counsel's complaint or litigated in the subsequent

hearing. *E. g. General Teamsters & Allied Workers Union No. 992 v. NLRB*, 427 F.2d 582, 588 (D.C.Cir.1970); *United Packinghouse, Food & Allied Workers Int'l Union v. NLRB*, 416 F.2d 1126, 1134 n.12 (D.C.Cir. 1969), *cert. denied*, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179.[25] Even where the record contains evidence supporting a remedial order, the court will not grant enforcement in the absence of either a supporting allegation in the complaint or a meaningful opportunity to litigate the underlying issue in the hearing itself. *E. g. United Packinghouse, supra; Montgomery Ward & Co., supra.*

■ Here we have a situation in which the Union filed charges with the Board containing allegations which, if proved, could lead to a finding that the Company violated sections 8(a)(1) and (5) by failing or refusing to apply the contract to its non-union employees and refusing to deal with the Union on behalf of the non-union employees. But these allegations were not carried over and specifically pleaded in the complaint subsequently issued by the Board's General Counsel. Nevertheless, the ALJ's decision and the Board's order were based in part on the 8(a)(1) and (5) violations not in the complaint.

The Board argues that the variation between the General Counsel's complaint and the eventual findings of unfair labor practices is permissible because the Company actually was aware that the 8(a)(1) and (5) violations were in issue in the hearing and had ample opportunity to present its defense. *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 349–51, 58 S.Ct. 904, 912–13, 82 L.Ed. 1381 (1938). The Board relies on the principle that "a material issue which has been fairly tried by the

---

**22.** Company's Brief at 16; Stipulation entered October 20, 1980.

**23.** 5 U.S.C. § 554(b)(3).

**24.** 29 C.F.R. § 102.15.

**25.** *See also NLRB v. Local Union 25, IBEW*, 586 F.2d 959, 961 (2d Cir. 1978); *NLRB v. Sunnyland Packing Co.*, 557 F.2d 1157, 1161 (5th Cir. 1977); *NLRB v. Tamper, Inc.*, 522 F.2d 781, 787–89 (4th Cir. 1975); *Engineers & Fabri-*

*cators, Inc. v. NLRB*, 376 F.2d 482, 485 (5th Cir. 1967); *Boyle's Famous Corned Beef Co. v. NLRB*, 400 F.2d 154, 162–64 (8th Cir. 1967); *Montgomery Ward & Co. v. NLRB*, 385 F.2d 760, 763–64 (8th Cir. 1967); *J. C. Penney Co. v. NLRB*, 384 F.2d 479, 483 (10th Cir. 1967); *NLRB v. Johnson*, 332 F.2d 216 (6th Cir. 1963); *NLRB v. H. E. Fletcher Co.*, 298 F.2d 594, 600 (1st Cir. 1962).

parties may be decided by the Board regardless of whether it has been specifically pleaded." *NLRB v. Thompson Transport Co.*, 421 F.2d 154, 155 (10th Cir. 1970) (cases cited); *United Packinghouse, Food & Allied Workers Int'l Union, AFL–CIO v. NLRB*, 416 F.2d 1126, 1134 n.12 (D.C.Cir.1969), *cert. denied*, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179; *Electri-Flex Co. v. NLRB*, 570 F.2d 1327, 1335 (7th Cir. 1978), *cert. denied*, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256; *accord General Teamsters & Allied Workers Union No. 992 v. NLRB*, 427 F.2d 582, 588 (D.C.Cir.1970). In support of its position the Board notes that the General Counsel's complaint contained a definition of the bargaining unit encompassing all employees in the job classifications described in the contract; and it also included general allegations of section 8(a)(1) and (5) violations based on conduct which affected all of the Company's employees. From these inclusions, the Board seems to maintain that the complaint was sufficient to apprise the Company that the hearing and remedial order would not be limited to Company actions involving only the six Union employees. However, the heart of the Board's argument is that the hearing record itself demonstrates that the Company's attorney fully understood that the Company's responsibilities toward all employees with job descriptions within the unit were at issue and that he had an adequate opportunity to,

and in fact, did, present the Company's defense to such charges.

However, after carefully reviewing the transcript of the several day hearing, we conclude that the record does not support the Board's position. At no point in the hearing do we find a clear statement from the counsel for the General Counsel (General Counsel) to the Company or the ALJ that the Company was on trial for its failure to apply the contract to non-union employees and to deal with the Union as their representative. On the contrary, we garner both from what the General Counsel did say on several occasions and from what, on other occasions, inexplicably, he did not say, that, notwithstanding any possible ambiguity in the complaint, he was not pursuing the 8(a)(1) and (5) violations now challenged by the Company.

The General Counsel never, so far as we can tell, indicated to the Company, much less affirmatively attempted to show, that the Company's actions toward its non-union employees comprised a central element of its case. The vast bulk of the testimony of Board witnesses went toward proof of the *alter ego* relationship between Blake and M & S. In that context, the limited evidence relating to the non-union employees was incidental to the main thrust of the Board's case that there was continuity of operations between Blake and M & S and that the changeover was merely a device to avoid meeting Union demands.[26] The Company

---

**26.** Only three of Blake's non-union employees testified briefly as to the continuity of their duties and pay before and after the Company changeover. This testimony clearly was part of the General Counsel's main *alter ego* case.

The only possible indication of another purpose for their testimony came during the direct examination of the first witness. The Company Counsel objected to the relevance of questioning the witness about a conversation with a Company supervisor that might show an 8(a)(1) violation not alleged in the complaint. Tr. 370, 372. The General Counsel represented that he was "not prepared to say it constituted an 8(a)(1) violation," but that the conversation was nevertheless relevant. He did not, however, state for what purpose the conversation was relevant but merely that he would establish relevance through later witnesses with testimony about "all of the employees who are not in the Union signing cards." Tr. 370–72.

When pressed by Company Counsel he conceded, "I'll state right now that I'm not going to amend the complaint to include an 8(1).... I don't believe it's appropriate to be alleged as 8(1)." Tr. 372. And at another point in the hearing he represented that non-union employees were "not subject to this complaint as 8(3)'s" but only "subject to the complaint in terms of being hired by M & S Company...." Tr. 105. Whatever they mean, these exchanges were altogether too elliptical to establish that the Company understood that the purpose of the three non-union witnesses was to prove the unlawfulness of the Company's actions toward its non-union employees.

The only other evidence in the record concerning non-union employees was expressly admitted only as "background" to show "a chain of events, that the Union was on notice as to a certain situation" and not for the "truth" of the contract's application to specified employees.

counsel objected repeatedly that testimony about the pay rates and working conditions of non-union employees was irrelevant since the complaint only addressed the named Union employees and that the coverage of the contract, and the scope of the unit were not questions properly before the ALJ.[27] The General Counsel responded each time either that the objected to testimony about non-union employees was merely "background," or relevant to the "chain of events" in its *alter ego* case, or not offered for the truth of the matter asserted.[28] Invariably, the objection was overruled on the basis of such assertions and the testimony admitted for the limited purpose stated. At other times the General Counsel merely responded to the Company Counsel's objection with silence.[29] Not once, however, did the General Counsel forthrightly take issue with the Company Counsel's statement of the limited nature of the proceeding or explicitly state that he was in fact seeking a finding of the Company's liability for the 8(a)(1) and (5) violations challenged here.[30] We believe that affording such notice during the proceeding was a minimal obligation especially in light of the General Counsel's failure to specifically plead such violations in the complaint after the Union had included them in its original charges filed with the Board.

We can only speculate whether the confusing series of passes that counsel on both

---

Tr. 330–32, 381–83. Indeed, the comparatively few and brief references to non-union employees in a 556 page transcript in itself tends to refute the notion that the subject of their rights under the contract, an issue of greater potential economic consequence to the Company than the six Union members' treatment, was thoroughly litigated.

27. For example, consider this exchange during the General Counsel's opening statement:

General Counsel: ... Some time in July of 1977, the business agent for the [Union] received a call from an employee working for Blake Construction, complaining, among other things, that he was not being paid union scale.

Company Counsel: Your Honor, I am going to interrupt and object here. There is nothing in the Complaint concerning a failure to pay Union scale, and I don't think Counsel for the General Counsel has a right to prejudice the Court with remarks that aren't encompassed in any allegation of the Complaint.

ALJ: Well ... this is not a jury trial, so please let [General Counsel] make an opening statement uninterrupted, irrespective of whether or not it contains relevant or irrelevant information.

Tr. 23–24. Similar objections were raised throughout the hearing. For example,

General Counsel: Did you speak to all the other employees on the 17th as well, other employees of Blake?

Company Counsel: Objection; there are no other employees named in the Complaint.

ALJ: Which employees are you referring to?

General Counsel: Other employees who were not in the Union who were working for Blake.

Company Counsel: They're not the subject of this Complaint, Your Honor. There are seven named people.

General Counsel: They are not subject to this Complaint as 8(3)'s. They are subject to the Complaint in terms of being hired by M & S Company, from M & S to Blake.

ALJ: All right, overruled.

Tr. 105. And for example,

Company Counsel: Objection as to the statement "employees not in a Union." If we're interested in continuity of employment, then what employees did, and whether or not they were in the union, is irrelevant.

ALJ: Objection overruled.

Tr. 108. *See also* Tr. 106, 163–64, 330–332, 335–36, 379–82. The Company reiterated its position in its brief to the ALJ: "[The Union] treated its agreement with Blake as covering seven named employees and no others ... General Counsel made no allegation that the terms of any contract were breached as to coverage for any but the named seven." Company's brief dated October 6, 1978 at 9–10, J.A. at 40–41.

28. *E. g.* Tr. 105, 331, 332, 336, 379, 382.

29. *E. g.* Tr. 23, 108, 158–59, 163–64.

30. The General Counsel persistently failed to correct or clarify the Company Counsel's and the ALJ's understanding of the scope of the lawsuit. See, *e. g.,* colloquy at 158–59. *See also* Tr. 410–416 (General Counsel argued that grievance of non-union member for Union's failure to represent was irrelevant, Tr. 416) (General Counsel does not take issue with Company Counsel statement that "this Complaint doesn't go to any of the nonunion people," Tr. 412); *and see* General Counsel's Post-Hearing Brief filed October 6, 1978, at 13, J.A. at 58 ("the question of appropriate unit is relevant only to the extent that it established a predicate for Blake's subsequent unfair labor practices").

sides made regarding non-union employees stemmed from a genuine failure to communicate their assumptions to one another, or from a misbegotten tactical strategy on the General Counsel's part to play a cat-and-mouse game. But on the existing record we cannot see how the Company could be held to have actual knowledge that it was being charged directly with failure to apply the contract to non-union employees or to deal with the Union as their representative. Hence it would not be fair now to order enforcement of an order based on such charges. *Cf. NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 350, 58 S.Ct.

904, 912, 82 L.Ed. 1381 (1938) (due process claim rejected when "at no time during the hearings was there any misunderstanding as to what was the basis of the Board's complaint").

Nor can we agree with the Board that the Company actually litigated its available defenses to the 8(a)(1) and (5) violations so as to justify enforcing the challenged portions of the order.[31] Indeed, when the Company Counsel sought to probe the Union's own behavior toward the non-union employees, he was cut off by the ALJ upon the General Counsel's objection that it was unnecessary to explore this subject.[32]

31. The Company represents that had it been squarely presented with 8(a)(1) and (5) charges it could have defended on a number of grounds including: (1) that the charge was untimely; (2) that a prior oral or written addendum to the contract altered the scope of the unit at Blake; (3) that the scope of the unit had been altered by actions of the parties from that specified in the contract; (4) that the Union had waived its right to enforce the contract or had acquiesced in some unit other than the one described in the contract. Company's Brief at 29. We, of course, do not pass on whether any of these defenses were available or whether the Company would have succeeded if they had been asserted. But we do note that although there is some evidence related to these defenses on the record it is apparent that they were not pursued with even a modicum of the vigor displayed on behalf of the Company in other less potentially vital areas. *See e. g.* regarding the defense of waiver: (Tr. 373, 400–01, 427–29, the Union's failure to enforce the contract's Union security provision); (Tr. 373–74, 427, 430, the Union's failure to file any grievance on behalf of nonmembers, line of question opposed as irrelevant by General Counsel); (Tr. 407–12, 414, 417, Union's filing of grievance only on behalf of the Union member employees, line of questioning opposed as irrelevant by General Counsel and cut off by ALJ); regarding the defense of agreement or acquiescence to a new unit: (Tr. 433–36, RX3, prior refusal by Company to include non-union employees under the contract unchallenged by Union, line of question successfully opposed by General Counsel) ("RX—" refers to the Company's exhibits).

32. General Counsel: Objection, Your Honor. I'm going to object to this line of questioning. *What transpired in '76 has nothing to do with the Complaint.* What a prior Union administration may have done with respect to Blake has nothing to do with the Complaint. It's all of course Pre 10(b) as well. *I don't think*

*it has any bearing at all on the matters at issue.*
ALJ: [D]o you want to reply to that?
Company Counsel: Yes, I do, Your Honor. First, the contract which General Counsel offered into evidence predates the current administration. Secondly, General Counsel has stated, in arguing before you yesterday as to the relevancy of the '78 sign-up, that that somehow or other triggered the change from Blake to M & S. I want to show that the very same thing happened in '76, therefore people signing cards don't trigger subcontractors. And I want to show that the administrations, both administrations, both the current one and the old one, how they viewed the collective bargaining agreement, or what the collective bargaining agreement was.
General Counsel: Well, as to [Company Counsel's] argument, first, it sounds as if he's trying to erect some kind of habit argument; the fact that Blake may have been a good guy in 1976, of course, cannot be shown with respect to whether they were a good guy in '78. As I say, *this has absolutely no bearing on what may or may not have happened in '76, to the Complaint at issue here, which is what took place on February 17th, and thereafter.*
ALJ: All right, objection sustained.
Company Counsel: Do I take it then that Your Honor is ruling that I cannot go into how the parties treated the collective bargaining agreement, or what they thought the collective bargaining agreement was, prior to July of 1977?
ALJ: Right. I think your cross-examination goes beyond those areas covered by direct. Tr. 432–34. (Emphasis supplied.) Upon an appeal of this ruling, J.A. at 23, the Board directed the hearing to be reopened to "permit [the Company] to cross-examine the witness with respect to the administration of the Contract in 1976." Board Order dated August 1, 1978, J.A. at 27. At a hearing held pursuant to

We surmise from the hearing transcript there was little doubt as to the nature of the underlying dispute. When the formerly moribund Union began to aggressively solicit new members and to seek to represent their interests with the Company, the Company sought to limit the application of the existing contract to existing Union members or to avoid it altogether by resort to a corporate shell game. Nevertheless, no matter how reprehensible the Company's conduct, it does not excuse the Board or its General Counsel from a duty to assure that a charged party is given adequate notice of all the alleged violations of the Act and that these violations are litigated before sanctions are imposed. Elemental procedural due process prevents this court from granting enforcement of remedies that go beyond the scope of the complaint and are directed toward violations of the Act not noticed or actually tried before the ALJ or the Board.

2. *The Waiver Issue*

The Board in its reply brief asserts a threshold argument that the Company is barred by section 10(e) of the Act from raising its due process claim on appeal because it failed to do so before the Board. Section 10(e) of the Act provides in pertinent part:

> No objection that has not been urged before the Board, its member, agent, or agency shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.

29 U.S.C. § 160(e). In addition, the Board's rules provide that "[a]ny exception to a ruling, finding, conclusion, or recommendation which is not specifically urged shall be deemed to have been waived," 29 C.F.R. 102.46(b), and "[n]o matter not included in exceptions or cross-exceptions may there-

after be urged before the Board, or in any further proceeding." 29 C.F.R. § 102.46(h). In short, the Board ironically says that even if it did not provide the Company with notice or an opportunity to litigate every violation found against the Company, the Board itself must have notice and an opportunity in the first instance to consider any resulting challenge to the fairness of its decision.[33]

In fact, the Company did take exception to the ALJ's finding that the Company violated sections 8(a)(1) and (5) of the Act and to the ALJ's related conclusions of law and remedial measures. However, the Company did not expressly assert due process objections to the way the hearing was conducted. For example, the Company characterized most of the ALJ's findings as "misstatements" and excepted to the ALJ's conclusions of law as "based on misstatements of facts, mistaken premises, suppositions, hearsay, and misapplication of law." Respondent's Exceptions, *supra*, J.A. 29–30. But in its brief in support of its exceptions, J.A. 74–87, the Company Counsel did argue, *inter alia*, that the 8(a)(1) and (5) violations were not supported by substantial evidence because there was no proof of a contract covering all employees, J.A. 74–75; and although it did not specifically raise the due process issue, it stated that the General Counsel had not included an allegation in the complaint "that the terms of any contract were breached as to coverage for any but the named seven [Union employees]." J.A. at 85. It also objected specifically to the ALJ's refusal to allow questioning as to "how the parties treated the contract." J.A. 77.

The Board argues that these objections are too vague to satisfy the requirements of section 10(e). *See Marshall Field & Company v. NLRB*, 318 U.S. 253, 255, 63 S.Ct. 585, 586, 87 L.Ed. 744 (1943); *NLRB v. Seven-*

---

this order on September 7, 1978, Company Counsel elicited that the witness had spoken with counsel for the Union and elected not to question the witness further. Tr. 559–60.

33. Of course we respect the policy underlying section 10(e) reflected in the "general rule that courts should not topple over administrative decisions unless the administrative body not

only has erred but has erred against objections made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952); *NLRB v. Ochoa Fertilizer Corp.*, 368 U.S. 318, 322, 82 S.Ct. 344, 347, 7 L.Ed.2d 312 (1961).

*Up Bottling Company,* 344 U.S. 344, 350, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953).

■■ We disagree because we think the Company's brief accompanying its exceptions to the ALJ's decision, and in particular the above-quoted language about the scope of the complaint, the lack of proof as to what the contract provided as well as the ALJ's refusal to allow cross-examination on the subject were adequate to apprise the Board that the Company intended to press the question now presented and thus there was no waiver of the right to argue the due process issue before this court. *May Department Stores Co. v. NLRB,* 326 U.S. 376, 386–87 n.5, 66 S.Ct. 203, 209–10 n.5, 90 L.Ed. 145 (1945). While the Company's objections are no paragon of precision or detail, the specific exceptions to the 8(a)(1) and (5) findings and the argument that these findings were not supported by evidence and that no notice was given in the complaint as to such violations are consider-

ably more focused and quite different from the general *pro forma* objections found to be impermissibly vague in other cases relied on by the Board. *See, e. g., Marshall Field, supra,* (only objection was examiner erred "in making each and every recommendation"); *Seven-Up, supra* (only objection was the remedy was "contrary to, and unsupported by, the evidence and contrary to law").[34]

In sum, it goes against the grain to uphold a finding of a violation not charged in the complaint, never acknowledged in the hearing, and objected to in some detail before the Board simply because the magic phrase "due process" was not used in the objection. We do not think section 10(e) requires such a triumph of technical pleading over fundamental fairness.

**B. *Paragraph 1(e) of the Board's Order***

Finally, paragraph 1(e) of the Board's order prohibits the Company from:

> *Cheney California Lumber Co.,* 327 U.S. 385, 388, 66 S.Ct. 553, 554, 90 L.Ed. 739 (1946) (Board without jurisdiction); *NLRB v. Mark J. Gerry, Inc.,* 355 F.2d 727 (9th Cir. 1966), *cert. denied,* 385 U.S. 820, 87 S.Ct. 46, 17 L.Ed.2d 58 (Board without jurisdiction but also appeared that question might have been raised below); *see also NLRB v. Doug Neal Management Co.,* 620 F.2d 1133, 1139 (6th Cir. 1980) (court raised issue of indispensible party *sua sponte* notwithstanding section 10(e) in interests of equity).

While deference is certainly due the laudatory objective of section 10(e) to give the Board the first opportunity to resolve "on the merits" questions urged on review of its orders, *Marshall Field, supra,* 318 U.S. at 256, 63 S.Ct. at 586, courts are and should be reluctant to enforce orders that emanate from proceedings conducted contrary to the clear requirements of the Administrative Procedure Act and devoid of basic due process guarantees unless there has been a deliberate bypass of the Board's rules. Here the Company's exception to the sufficiency of the evidence underlying the ALJ's 8(a)(1) and (5) findings gave the Board a chance to reconsider the merits of the ALJ's decision. In doing so, the Board could not have examined, even cursorily, the ALJ's findings without discovering in the transcript the ongoing swords-crossing exercise between counsel as to the relevance of evidence about non-union employees. *See May Department Stores, supra.*

---

34. *NLRB v. United Shoe Machinery Corp.,* 445 F.2d 633, 634 (1st Cir. 1971) (objection to Board decision in its entirety as "contrary to constitutional principles of due process" was "too broad to call attention to the narrow point raised ... or to suggest that this was [the] point"); *see also Singer Co. v. NLRB,* 429 F.2d 172, 180–81 (8th Cir. 1970) (objection to "The Recommended Order in its entirety ... as said recommended order is against the preponderance of the evidence and the law").

There are additional reasons for reaching the Company's substantial due process claim. Failure to object at the Board level does not invariably deprive a court of the ability to decide that the hearing was fundamentally flawed for lack of procedural fairness. *NLRB v. Local Union No. 25, IBEW,* 586 F.2d 959 (2d Cir. 1978) (party took exception below to a specific finding, but on different grounds than urged on appeal, and the Board is not prejudiced thereby); *accord ILGWU, AFL–CIO v. NLRB,* 339 F.2d 116 (2d Cir. 1964) (failure to object not deliberate and no prejudice to Board); *cf. Retired Persons Pharmacy v. NLRB,* 519 F.2d 486 (2d Cir. 1975) (due process claim is barred when there is no prior objection at all on substantive or procedural grounds and no extraordinary circumstances to warrant review); *NLRB v. Kobritz,* 193 F.2d 8 (1st Cir. 1951) (due process objection "obviously without merit" not raised with the Board is barred by section 10(e)).

*Cf.* authority for the proposition that review is not precluded in the absence of objection below when the Board has patently traveled outside the orbit of its authority. *NLRB v.*

*In any other manner* interfering with, restraining or coercing its employees in the exercise of their rights to self-organization, to form, join, or assist [the Union], or any other labor organization, to bargain collectively through representatives of their own choosing, to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection, or to refrain from any and all such activities.

J.A. at 13 (emphasis supplied). The Company contends that this portion of the order is too broad and that it impermissibly subjects the Company to contempt proceedings for any future violation of its employees' rights under the Act.

■■■ The Board has wide latitude to exercise its remedial powers under the Act. *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 215–17, 85 S.Ct. 398, 405–06, 13 L.Ed.2d 233 (1964); *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 346–47, 73 S.Ct. 287, 288–89, 97 L.Ed. 377 (1953); *Phelps-Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941); *Int'l Ass'n of Machinists v. NLRB*, 311 U.S. 72, 82, 61 S.Ct. 83, 89, 85 L.Ed. 50 (1940). However, there are limits to the remedies the Board may issue based on the nature and extent of the violations it finds:

[T]he authority conferred on the Board to restrain the practice which it has found the employer to have committed is not an authority to restrain generally all other unlawful practices which it has neither found to have been pursued nor persuasively to be related to the proven unlawful conduct.

*NLRB v. Express Publishing Co.*, 312 U.S. 426, 433–34, 61 S.Ct. 693, 698, 85 L.Ed. 930 (1941). The Supreme Court has held that an isolated violation of the Act

does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit

some new violation unlike and unrelated to that with which he was originally charged.

*Id.* at 435–36, 61 S.Ct. at 699.[35] In contrast, substantial evidence of a "generalized scheme" to violate the Act will support such broad relief. *San Francisco Local Joint Executive Board of Culinary Workers v. NLRB*, 501 F.2d 794, 802 (D.C.Cir.1974).

Both the Company and the Board agree on the test to be applied in this case:

[s]uch an order is warranted only when a respondent is shown to have a *proclivity* to violate the Act, or has engaged in such *egregious or widespread* misconduct as to demonstrate a general disregard for the employees' fundamental statutory rights.

*Hickmott Foods, Inc.*, 242 NLRB No. 177 (1979) (emphasis supplied); *Honsa Mold, Inc.*, 243 NLRB No. 146 (1979); *NLRB v. Union Nacional de Trabajadores*, 540 F.2d 1, 11 (1st Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); *NLRB v. Curtis Manufacturing Co.*, 421 F.2d 1335 (5th Cir. 1970). The Board adopted paragraph 1(e) because "the issuance of a broad order is warranted in this case as [the Company's] unlawful conduct was egregious and widespread and demonstrated a general disregard for the employees' fundamental statutory rights." J.A. at 19 n.3. We agree that the facts of this case are flagrant enough to support the Board's expansive remedial provision.

■■■ The Company's actions in refusing to talk to the Union about contract pay rates for its new members, culminating in a dramatic, albeit transparent, turnover of all company activities to an *alter ego*, solely to abrogate its obligations under the Act unquestionably rise to the level of "a general disregard for the employees' fundamental statutory rights." This maneuver was exacerbated by the deplorable techniques used in the individual bargaining with the Union employees to drastically lower their current rates of pay: confronting the employees

---

35. *See also General Motors Co. v. NLRB*, 512 F.2d 447, 448 (6th Cir. 1975); *NLRB v. Curtis Manufacturing Co.*, 421 F.2d 1335, 1337 (5th Cir. 1970); *NLRB v. Kingwood Mining Co.*, 404 F.2d 348 (4th Cir. 1968); *NLRB v. Scherer & Sons, Inc.*, 370 F.2d 12, 13 (5th Cir. 1967), *cert. denied*, 389 U.S. 836, 88 S.Ct. 46, 19 L.Ed.2d 97.

with the Solomonic dilemma of choosing between lower take home pay or slightly higher take home pay which was still appreciably less than the employees' current rates of pay and did not include necessary benefits. The Company's conduct in this regard and the lengths to which it went to perpetuate that conduct are reminiscent more of the pre-National Labor Relations Act era of industrial warfare than of the latter Twentieth Century. The mere fact that the Company has no prior record of NLRB violations does not, in itself, dissipate the egregiousness of the conduct involved in this proceeding. *Cf. NLRB v. Beth-Israel Hospital*, 554 F.2d 477 (1st Cir. 1977), *aff'd*, 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978) (non-profit hospital's concern about deleterious effects on patients of organizational conduct was reasonable, and although hospital failed to justify its no solicitation, no distribution rule as it related to some parts of the hospital (cafeteria and coffee shops) it could not be reasonably inferred from a single violation *of this character* that the hospital had a proclivity knowingly to violate the Act, thus justifying a broad order).[36] We find, therefore, that paragraph 1(e) is warranted and conclude that the Company's opposition to its enforcement is without merit.

*Enforcement granted in part and denied in part and remanded*

---

**36.** *Compare also* with the present case, *Blount Bros. Corp. v. NLRB*, 571 F.2d 4 (7th Cir. 1978) (incident involving one out of 1,000 employees at company with no prior history of unfair labor practices did not justify order prohibiting violating the Act "in any other manner"); *NLRB v. Curtis Manufacturing Co.*, 421 F.2d 1335, 1337 (5th Cir. 1970); *J. P. Stevens & Co. v. NLRB*, 417 F.2d 533, 539 n.11 (5th Cir. 1969) (if no showing of proclivity to violate the Act the scope of the orders must be limited); *Richfield Oil Corp. v. NLRB*, 143 F.2d 860 (1944) (violation was a mistake of law and no evidence of general attitude or conduct on employer's part to violate the Act).