KAREN LECRAFT HENDERSON, Circuit Judge,
dissenting in part.
I join my colleagues in the majority except in two crucial respects. Because our role in reviewing the orders of the National Labor Relations Board (Board) requires u's to do more' than simply sign off on its unfair labor practice findings, see, e.g., Crowley Marine Sens., Inc. v. NLRB, 234 F.3d 1295, 1303 (D.C.Cir.2000) (“[O]ur review is not ‘ “a mere rubber stamp substituting judicial abdication for judicial review.” ’ ” (quoting Gen. Elec. Co. v. NLRB, 916 F.2d 1163, 1168 (7th Cir.1990) (quoting NLRB v. Hanstone Mfg. Co., 785 F.2d 570, 574-75 (7th Cir.1986)))) (Henderson, J., dissenting), or mechanically enforce its remedies, see, e.g., Peoples Gas Sys., Inc. v. NLRB, 629 F.2d 35, 42 (D.C.Cir.1980) (“[T]his court is a reviewing court and does not function simply as the Board’s enforcement arm.”), I cannot join the decision to uphold the Board’s finding that Federated Logistics & Operations (Federated) committed an unfair labor practice by threatening futility; nor do I agree with the Board’s imposition of several “extraordinary” remedies. As the Board offered neither a reasonable explanation nor one based on substantial evidence in the record to support either, see, e.g., Gen. Elec. Co. v. NLRB, 117 F.3d 627, 630 (D.C.Cir.1997), I believe that the former constitutes a misappraisal — which deprived Federated of its right to free expression protected by the Act — -and the latter amount to punitive rather than remedial measures. I would therefore hold that Federated’s petition should be granted in part and, accordingly, do not join sections II.A and II.D of the majority opinion.
I.
Judicial review of the Board’s findings of unfair labor practices is admittedly deferential but it is not “so deferential that the court will merely act as a rubber stamp for the Board’s conclusions.” Titanium Metals Corp. v. NLRB, 392 F.3d 439, 445 (D.C.Cir.2004) (citing Pa. State Educ. Ass’n-NEA v. NLRB, 79 F.3d 139, 148 (D.C.Cir.1996)). Because the Board’s findings of fact are, by statute, conclusive “if supported by substantial evidence on the record considered as a whole,” 29 U.S.C. § 160(e), we will uphold them unless upon a review of the entire record we conclude that they are not supported by the required quotient of evidence “or that the *931 Board acted arbitrarily or otherwise erred in applying established law to the facts of the case.” Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers v. NLRB, 41 F.3d 1532, 1536 (D.C.Cir.1994) (internal quotation marks & citations omitted); see also Stanford Hosp. & Clinics v. NLRB, 370 F.3d 1210, 1212 (D.C.Cir.2004) (“Our review is limited to determining whether the Board’s findings of fact are supported by substantial evidence and, if so, whether the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case.”). “ ‘Substantial evidence means “such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” ’ ” Evergreen Am. Corp. v. NLRB, 362 F.3d 827, 837 (D.C.Cir.2004) (quoting MECO Corp. v. NLRB, 986 F.2d 1434, 1436 (D.C.Cir.1993) (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971))). We do not review just the evidence supporting the Board, however; we also review “anything in the record that ‘fairly detracts’ from the weight of th[at] evidence.” Gen. Elec. Co., 117 F.3d at 630 (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)) (Tatel, J.); accord CitiSteel USA, Inc. v. NLRB, 53 F.3d 350, 355 (D.C.Cir.1995) (Board must “provide ... reasons for discounting the contrary evidence.”).
Even under this deferential standard, I disagree with the majority that substantial record evidence supports the Board’s finding that Federated’s managers unlawfully threatened Federated’s employees that unionization would prove futile. None of the statements made by vice presidents Joe Vella and Kevin Hart — that bargaining would start from “zero,” that work could be moved to another facility in the event of a strike and that employees could lose their 401(k) plan following unionization— supports the Board’s “threat” finding, whether viewed independently or in the “totality of the circumstances.”[1] Although the National Labor Relations Act (NLRA, Act), §§ 1 et seq., as amended, 29 U.S.C. §§ 151 et seq., makes it an unfair labor practice for employers “to interfere with, restrain, or coerce employees in the exercise of’ their associational rights, id. § 158(a)(1), it also protects the employer’s First Amendment right to express its views, including reasonable predictions about the consequences of unionization, so long as they “eontain[ ] no threat of reprisal or force or promise of benefit,” id. § 158(c). “[A] ‘threat of reprisal’ means a ‘threat of retaliation’ and this in turn means not a prediction that adverse consequences will develop but a threat that they will be deliberately inflicted in retupn for an injury—‘to return evil for evil.’ ” Crown Cork & Seal Co. v. NLRB, 36 F.3d 1130, 1138 (D.C.Cir.1994) (emphases in original) (quoting NLRB v. Golub Corp., 388 F.2d 921, 928 (2d Cir.1967) (Friendly, J.)).
Vella’s and Hart’s statements that bargaining with the Union would start from “zero” gave an accurate and lawful, albeit blunt, picture of the vagaries of the collective bargaining process. See Joint Appendix (J.A.) 299 (“Mr. Hart stated that we would start from zero and we would negotiate from that. Any benefits we may *932 have at this time could be jeopardized in that proceeding.”); J.A. 312 (“[W]e could start from ground zero ... They said we’d be starting at zero. We might go up. We might end up getting less than what we’re making now.”); J.A. 354 (“I asked them how can they start off with zero .... They said the union can do [sic].”). The statements neither implied that Federated intended to bargain in bad faith nor threatened a strategy of slashing wages and/or benefits in advance of negotiations; they indicated only, and truthfully so, that what the process held for the employees— “more, the same, or less,” J.A. 48; see also J.A. 95 — -was hard to predict at the outset. Their statements, moreover, made clear that whatever the final result, it would be the product of negotiations, not unilateral retaliatory action.
Neither do I find the statements that unionization might trigger a strike, a plant shut-down or loss of the employees’ 401 (k) plan unlawful. An employer walks a fíne line in predicting the effect of unionization on its business, see NLRB v. Gissel Packing Co., 395 U.S. 575, 618-19, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), for its predictions must be “carefully phrased on the basis of objective fact to convey an employer’s belief as to demonstrably probable consequences beyond [its] control” and not leave the impression that it “may or may not take action solely on [its] own initiative for reasons unrelated to economic necessities and known only to [it],” id. at 618, 89 S.Ct. 1918. But “ ‘[m]ere references to the possible negative outcomes of unionization,’ ” Flamingo Hilton-Laughlin v. NLRB, 148 F.3d 1166, 1174 (D.C.Cir.1998) (quoting UARCO, Inc., 286 NLRB 55, 58 (1987); alteration in original), fall within section 8(c)’s protection, 29 U.S.C. § 158(c). While Vella and Hart may have walked the line, the evidence failed to demonstrate that they crossed it. The Board concluded that “unsupported employer predictions that a strike and then a plant shut down will follow a union victory are objectionable and unlawfully coercive,” Federated Logistics & Operations, 340 NLRB No. 36, slip op. at 2 (2003) (emphasis added), but the ALJ nowhere found that Federated intended to visit any of these “evils” on its employees, only that they were possibilities. See id. at 13 (“[Management stated that they could shut the building down in 3 days and move the operation elsewhere if negotiations were unsuccessful ....”); id. (employees “could lose their benefits and 401(k) plans”) (emphasis added); id. at 14 (“work could be moved in the event of a strike”) (emphasis added); see also, e.g., J.A. 299 (“If we were to go on strike ... they could shut [the building] down, move it elsewhere and just start back up again.”) (emphasis added). Vella’s and Hart’s prediction that employees could lose their 401(k) plan, moreover, was squarely based on fact — i.e., the terms of the Union’s contract at Federated’s Secaucus facility, J.A. 62, 99. See Gissel Packing Co., 395 U.S. at 618, 89 S.Ct. 1918. Because the managers’ statements only alluded to “possible negative outcomes of unionization,” Flamingo Hilton-Laughlin, 148 F.3d at 1174 (internal quotation marks omitted), the Board erred “by converting a possibility into a certainty, then declaring it a violation of the Act.” Gen. Elec. Co., 117 F.3d at 636; see Flamingo Hilton-Laughlin, 148 F.3d at 1174 (vacating violation because company president speculated about duration of negotiations based on what he “foresaw”).
The Board itself acknowledged that statements like these “are not per se unlawful,” Federated Logistics & Operations, 340 NLRB No. 36, slip op. at 1; see generally Shaw’s Supermarkets, Inc. v. NLRB, 884 F.2d 34, 37 (1st Cir.1989) (citing Board orders that found “bargaining from scratch” language lawful based on “factual *933 contexts ]”), but must be evaluated “in context” in order to assess
whether they “effectively threaten employees with the loss of existing benefits and leave them with the impression that what they may ultimately receive depends in large measure upon what the Union can induce the employer to restore,” or — conversely—whether they indicate that any “reduction in wages or benefits will occur only as a result of the normal give and take of collective bargaining.”
Federated Logistics & Operations, 340 NLRB No. 36, slip op. at 1 (quoting Plastronics, Inc., 233 NLRB 155, 156 (1977) & citing Capitol EMI Music, 311 NLRB 997, 1007-1008 (1993), enfd. 23 F.3d 399 (4th Cir.1994)); see Federated Logistics & Operations, 340 NLRB No. 36, slip op. at 2 (“[T]he Board must consider the impact of particular employer statements in the context of surrounding circumstances .... ”). The Board offered a variety of reasons for discounting the “surrounding circumstances” here, id., none of which I find reasonable. Indeed, the Board began its analysis with a proposition that is flatly contradicted by the administrative record: It found that Vella’s and Hart’s statements “uttered on the eve of the election” had “maxim[um] ... coercive impact” because Federated’s counterbalancing non-coercive statements were made “weeks” earlier, id., but Federated distributed campaign materials describing the “give and take” of the bargaining process immediately before as well as after the two meetings at which Vella and Hart made their predictions.[2] The Board also stated that “any lawful message in the PowerPoint presentation by Vella and Hart to employees was counteracted by their express statements that bargaining would start from ‘zero.’ ” Id. This ipse dixit is a peculiar one as it contradicts the commonsense audience view of printed text and oral presentation as complementary — not contradictory.
The Board also discounted the context in which Vella’s and Hart’s statements were made by observing that, while “a particular employer statement” may be “mitigated by other employer statements made at different times or places[,] [a]n employee might reasonably be influenced more by a coercive statement than by a different non-coercive statement.” Id. As discussed above, however, Vella’s and Hart’s statements were not coercive to begin with, and, in my opinion, could not have become so if considered in the larger context as required. See infra notes 4 & 5. The Board made the further point that Vella’s and Hart’s “coercive” statements “were not made in circumstances free from other unfair labor practices.” Federated Logistics & Operations, 340 NLRB No. 36, slip op. at 2 (internal quotation marks & citation omitted). While Federated’s separate unfair labor practices were without doubt part of the larger context in which Vella’s and Hart’s statements should have been considered, the Board did not explain how they negated Federated’s repeated and consistent statements that bargaining is a “ ‘give and take’ process” and that the *934 “result would be the product of good-faith bargaining.” Id.
In upholding the Board, the majority concludes that the managers’ statements were coercive even if viewed in the “totality of the circumstances” because “random” citations to “neutral language” in the administrative record “do not a coherent view make.”[3] Maj. Op. at 926. A quip does not a “coherent view” make either, however, and if charges of cherry-picking the record are to be tossed about, my colleagues would do well to duck. Taken as a whole the record does not reveal Federated’s “neutral language” • as mere platitudes within a larger campaign to threaten employees if they unionize. See Maj. Op. at 926. Rather, in my view, the record is so full of such “neutral language” that the picture it paints is one of a coherent company campaign presenting a consistent and lawful message: collective bargaining is a “give and take” process and, while the company intends to bargain in good faith, the process carries burdens as well as benefits.[4]
I also reject the majority’s observation that resolution of this issue “c[o]me[s] down to a credibility determination between the testimony of the managers as against that of three employees at the meeting.” Maj. Op. at 925. If that were the case, I would join the majority as it is settled that “[w]e accept the ALJ’s credibility determinations that are adopted by the Board ‘unless they are patently unsupportable.’ ” Schaeff Inc. v. NLRB, 113 F.3d 264, 266 (D.C.Cir.1997) (quoting NLRB v. Creative Food Design Ltd., 852 F.2d 1295, 1297 (D.C.Cir.1988)) (Henderson, J.). But credibility is not the issue. The issue is whether a reasonable person would consider the managers’ statements to be unlawful threats of futility if unionization were to occur. See Evergreen Am. Corp., 362 F.3d at 837. I say no.
II.
The Board’s remedial power under section 10 of the NLRA, which authorizes the Board upon finding an unfair labor practice to order the violator “to cease and desist from such unfair labor practice, and to take such affirmative action ... as will effectuate the. policies of [the Act],” 29 U.S.C. § 160(c); see United Food & Commercial Workers Int'l Union AFL-CIO v. NLRB, 852 F.2d 1344, 1347 (D.C.Cir.1988), “is a broad discretionary one, subject to limited judicial review.” Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Because the Board “draws on a fund of knowledge and expertise all its own,” Gissel Packing Co., 395 U.S. at 612 n. 32, 89 S.Ct. 1918, and following the United States Supreme Court’s lead, see Fibreboard Paper Prods. Corp., 379 U.S. at 216, 85 S.Ct. 398, we have repeatedly recognized that we owe Board remedial orders “special respect” and, consequently, our review of them is limited. Williams Enters., Inc. v. NLRB, 956 F.2d 1226, 1232 (D.C.Cir.1992); *935 see, e.g., Cobb Mech. Contractors, Inc. v. NLRB, 295 F.3d 1370, 1375 (D.C.Cir.2002) (“[T]he Board is accorded broad discretion in fashioning an appropriate remedy.”); Capital Cleaning Contractors, Inc. v. NLRB, 147 F.3d 999, 1009 (D.C.Cir.1998) (“[A] reviewing court must give special respect to the Board’s choice of remedy Teamsters Local 115 v. NLRB, 640 F.2d 392, 399 (D.C.Cir.1981) (“The Board’s choice of remedies is entitled to a high degree of deference.”); see also Synergy Gas Corp. v. NLRB, 19 F.3d 649, 654 (D.C.Cir.1994) (“Our review, both in theory and in practice, is quite deferential.”) (Silberman, J., concurring). Nevertheless, we remain a court of review — limited though our role may be — and not merely the Board’s Article III “enforcement arm.” Peoples Gas Sys., Inc., 629 F.2d at 42. Accordingly, as we have said, “[i]t is our responsibility to examine carefully both the Board’s findings and its reasoning, to assure that the Board has considered the factors which are relevant to its choice of remedy, selected a course which is remedial rather than punitive, and chosen a remedy which can fairly be said to effectuate the purposes of the Act.” Id. In short, the Board’s remedy must “be tailored to the unfair labor practice it is intended to redress,” Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 900, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984); see Cobb Mech. Contractors, Inc., 295 F.3d at 1375, and when it comes to “extraordinary” remedies, the Board is obligated to explain why conventional ones do not suffice. See Charlotte Amphitheater Corp. v. NLRB, 82 F.3d 1074, 1079 (D.C.Cir.1996).
The Board tells us that it reserves extraordinary remedies for cases involving unfair labor practices that are “so numerous, pervasive, and outrageous” that “special” remedies are necessary to “dissipate fully the coercive effects of the unfair labor practices found.” Federated Logistics & Operations, 340 NLRB No. 36, slip op. at 2 (internal quotation marks & citation omitted). This is such a case, it concluded, because Federated engaged in “extensive and serious unfair labor practices,” “some of’ its “unlawful conduct pervaded the unit,” its “unfair labor practices tended to have a long-term coercive impact on the unit,” and “many of the[ ] violations were committed by high-level management officials.” Id. at 3. Consequently, it imposed three “extraordinary” remedies to eliminate the effects of Federated’s assorted unfair labor practices — (1) the company is to cease and desist “from committing the specific violations found and from violating the Act ‘in any other manner,’ ” (2) the company is to supply the names and addresses of its employees to the Union every six months for two years and (3) a management official or Board agent is to read the notice of violations publicly. See id. at 3-4. However broad its discretion or hefty its expertise, the Board is required to match the cure to the ill; in selecting the remedies noted, however, the Board has vastly overmedicated.
The Board’s remedy must be “based on the nature and extent of the violations it finds,” NLRB v. Blake Constr. Co., 663 F.2d 272, 285 (D.C.Cir.1981); see NLRB v. Express Publ’g Co., 312 U.S. 426, 433, 61 S.Ct. 693, 85 L.Ed. 930 (1941) (Board’s authority regarding unfair labor practices does not include “authority to restrain generally all other unlawful practices which it has neither found to have been pursued nor persuasively to be related to the proven unlawful conduct”), and, thus, isolated unfair labor practices do “not justify an injunction broadly to obey the statute and thus subject the [violator] to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged.” Id. at 435-36, 61 S.Ct. 693. There is, however, an equally well-established exception to this rule: *936 “substantial evidence of a ‘generalized scheme’ to violate the Act” would support the sort of broad cease-and-desist order imposed here. Blake Constr. Co., 663 F.2d at 285 (quoting San Francisco Local Joint Executive Bd. of Culinary Workers v. NLRB, 501 F.2d 794, 802 (D.C.Cir.1974)). But the test is a stringent one as “ ‘[s]uch an order is warranted only when a [violator] is shown to have a proclivity to violate the Act, or has engaged in such egregious or widespread misconduct as to demonstrate a general disregard for the employees’ fundamental statutory rights.’ ” Blake Constr. Co., 663 F.2d at 285 (quoting Hickmott Foods, Inc., 242 NLRB No. 177 (1979)) (emphasis added; first alteration in original). Because Federated was a first-time violator, see Blake Constr. Co., 663 F.2d at 285-86; but see Teamsters Local 115, 640 F.2d at 399 (“[A]n employer who strikes the first blow hard enough may not need to strike another.”), the Board declined to find that the company exhibited any “proclivity” to violate the Act, concluding instead that its “.misconduct was sufficiently egregious and widespread to demonstrate a general disregard for the employees’ statutory lights.” Federated Logistics & Operations, 340 NLRB No. 36, slip op. at 4 n. 9. In so concluding, however, the Board failed to take account of (or explain away) the substantial record evidence demonstrating that, even as it committed unfair labor practices, Federated contemporaneously took actions designed to respect its employees’ rights.[5] Nor did the Board, in light of the unexceptional nature of Federated’s unfair labor practices and its counterbalancing good conduct, explain how Federated’s misconduct was of the kind and degree that the Board has in the past found sufficient to support a cease-and-desist order.[6] The Board observed, and the majority today repeats, see Maj. Op. at 929, that Federated committed “extensive and serious unfair labor practices,” Federated Logistics & Operations, 340 NLRB No. 36, slip op. at 3, but we have made clear that it is not enough for the Board to justify an extraordinary remedy “simply by reciting the employer’s unfair labor practices and commenting on their gravity.” Charlotte Amphitheater, 82 F.3d at 1079.
Relying on two cases from outside our circuit, the majority concludes that “[g]iv-en the scope of Federated’s communications offensive against the Union, and the multiple unfair labor practices it committed in attempting to prevent the Union from winning the election, it was reasonable for the Board to conclude that its misconduct was sufficiently persistent and widespread to warrant a broad cease and desist order.” Maj. Op. at 929. Neither of the two cases, see Coil-A.C.C., Inc. v. NLRB, 712 F.2d 1074, 1076 (6th Cir.1983); NLRB v. Union Nacional de Trabajadores, 540 F.2d 1, 11 (1st Cir.1976), nor one of ours that upheld a cease-and- *937 desist order, see Blake Constr. Co., 663 F.2d at 285-86, supports the majority inasmuch as their facts are so markedly different. In Coil-A.C.C., Inc. v. NLRB, the Sixth Circuit held that the Board was “clearly justified” in finding that the employer “manifested a general disregard for the fundamental statutory rights of its employees” because its owner personally and dramatically confronted two employees about their union sympathies and on three occasions “forewarned that he would cease operations at the plant and renew business operations elsewhere if necessary before he would permit unionism.” 712 F.2d at 1075-76; but see id. at 1077-78 (Krupansky, J., concurring in part & dissenting in part). The First Circuit’s decision in NLRB v. Union Nacional de Trabajadores involved misconduct of an exceptionally egregious nature—including multiple violent assaults, see id. at 6-9 and numerous death threats, see, e.g., id. at 7 (“ ‘This is Union Nacional and we kill people.’ ”), against management — which supported a finding not at issue here. See id. at 11. There, the court concluded that the administrative record “amply supported] the Board’s conclusions that the union has demonstrated a proclivity” to violate the Act, not only based on its numerous and flagrant violations but also because “[i]ts agents have stated, both in the course of their unlawful activities and in the hearings before the Board, that they do not regard themselves as subject to the authority of the Act and that they feel no obligation to conform their conduct to its requirements.” Id. (emphasis added).
Our own precedent also stands in strong contrast. In Blake Constr. Co., we explained that the employer’s efforts to avoid negotiating contract pay rates for new union members, which “culminatfed] in a dramatic, albeit transparent, turnover of all company activities to an alter ego, solely to abrogate its obligations under the Act[J unquestionably” manifested a general disregard for its employees’ rights. 663 F.2d at 285. “This maneuver was exacerbated,” the court added, by the employer’s approach to individual bargaining with union employees, which entailed “confronting the employees with the Solomonic dilemma of choosing between lower take home pay or slightly higher take home pay which was still appreciably less than the employees’ current rates of pay and did not include necessary benefits.” Id. at 285-86. The court concluded by observing that “[t]he [employer’s] conduct ... and the lengths to which it went to perpetuate that conduct are reminiscent more of the pre-National Labor Relations Act era of industrial warfare than of the latter Twentieth Century.” Id. at 286. Federated’s unfair labor practices hardly evoke the days of “industrial warfare.”
The Board likewise failed to justify the need for the two additional extraordinary remedies it prescribed. As the Board noted, Federated must furnish the Union with a list of employee names and addresses before the next election. Federated Logistics & Operations, 340 NLRB No. 36, slip op. at 4 n. 10. But to ensure “that [the Union] can present its message to employees outside the workplace in an atmosphere free from coercion,” id., the Board also ordered Federated to supply the names and addresses of its employees to the Union every six months for two years. Id. at 4. The Board nowhere explained why such a remedy was necessary — presumably — to counteract employees’ fear of discussing unionization at the Tampa facility. See, e.g., Excel Case Ready, 334 NLRB 4, 5 (2001) (ordering employer to provide union with employees’ names and addresses within one year on finding “usual Board remedies are not sufficient to undo the effects of the [employer’s] illegal activities” as it “systematically embarked on a campaign to rid its work force of leading union adherents”); Blockbuster *938 Pavilion, 331 NLRB 1274, 1275 (2000) (ordering employer to provide union with employees’ names and addresses within one year on finding it “essential to ensuring that employees may freely exercise their Section 7 rights” as “[t]he employees’ prior organizational efforts were aborted by the [employer’s] coercive tactics calculated to make employees afraid to associate themselves with the Union”). The majority nevertheless accepts the Board’s remedy, reasoning that Federated’s challenge fails because “it is long established that requiring the employer to disclose employee names and contact details to the union furthers NLRA objectives ‘by encouraging an informed employee electorate and by allowing unions the right of access to employees that management already possesses.’ ” Maj. Op. at 929 (quoting NLRB v. Wyman-Gordon Co., 394 U.S. 759, 767, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)). But another longstanding doctrine requires us to scrutinize the Board’s remedy to ensure that it is “tailored to the unfair labor practice it is intended to redress.” Sure-Tan, Inc., 467 U.S. at 900, 104 S.Ct. 2803; see Cobb Meek Contractors, Inc., 295 F.3d at 1375. Here, the Board failed to support the conclusion that necessarily underlies this remedy — ie., the Union could not communicate effectively with the employees — with record support. See Federated Logistics & Operations, 340 NLRB No. 36, slip op. at 3-4; see also id. at 8 (“[T]he record does not establish that the Union was unable to communicate with the employees.”) (Battista, Chrmn., dissenting in part).
The Board’s requirement that the notice of violations be read publicly by a management official or Board agent contains a similar defect. We have consistently “viewed public reading requirements with ... suspicion,” Teamsters Local 115, 640 F.2d at 402, recognizing the “ ‘ignominy of a forced public reading’ by an employer and its potential for oppression.” United Food, 852 F.2d at 1348 (quoting Int’l Union of Elec. Radio & Mach. Workers v. NLRB, 383 F.2d 230, 234 (D.C.Cir.1967)). Accordingly, we will not enforce such an order absent record evidence indicating a “particularized need” for it, Teamsters Local 115, 640 F.2d at 403; see United Food, 852 F.2d at 1348; cf. Ishikawa Gasket Am., 337 NLRB 175, 176 (2001) (“The reading of the notice by a respondent is an ‘extraordinary’ or ‘special’ remedy that will be imposed only where required by the particular circumstances of a case.”) (emphasis added); the touchstone of the “particularized need” requirement, as our cases make clear, is evidence of a “substantial link[ ]” between the public reading and the unfair labor practices. United Food, 852 F.2d at 1348; see Teamsters Local 115, 640 F.2d at 403-04; Conair Corp. v. NLRB, 721 F.2d 1355, 1385-87 (D.C.Cir.1983); cf. United Food, 852 F.2d at 1349 (“unique and specific facts of a case will more often than not provide the measure that allows a remedy in one case and precludes it in another”). By requiring a correlation between the misconduct and the public reading, we ensure that the latter is a remedy and not a punishment. Teamsters Local 115, 640 F.2d at 403 (concluding that “the negative aspects of the order overwhelm the marginal benefit”); see United Food, 852 F.2d at 1348-49. If there was a “substantial link[ ]” here, United Food, 852 F.2d at 1348, the Board failed to identify it. In addition to the public reading, the Board required that the notice of violations be posted in three languages at the Tampa facility. See Federated Logistics & Operations, 340 NLRB No. 36, slip op. at 5. The Board Chairman, in dissent and, in my view, correctly, criticized the Board’s support for the “particularized need” for a public reading, see id. at 8 (Battista, Chrmn., dissenting in part); the Board merely noted that violations were committed by “high-level manage *939 ment officials” and posited that the forced reading was needed “so that employees [would] fully perceive that [Federated] and its managers are bound by the requirements of the Act.” Id. at 3-4. As the Board has shown no particularized need for a public reading “to dispel the atmosphere of intimidation created in large part by [Federated’s] own statements and actions,” Conair, 721 F.2d at 1386-87, the public reading appears, at least to me, wholly punitive. See Capital Cleaning Contractors, Inc., 147 F.3d at 1009 (remedy must be “truly remedial and not punitive”). While the majority cites the Teamsters Local 115 rule that a public reading requirement will not be enforced absent a “particularized need,” 640 F.2d at 403; see United Food, 852 F.2d at 1348, it in truth applies an unprecedented and, I believe, incorrect standard, placing the burden on Federated to “rebut[] the existence of a particularized need for the public reading requirement.” Maj. Op. at 930. Because the Board failed to meet the burden it bears to explain, based on substantial record evidence, how the “extraordinary” remedies are tailored to redress Federated’s specific unfair labor practices, see, e.g., United Food, 852 F.2d at 1347, I would vacate the remedies. See Douglas Foods Corp. v. NLRB, 251 F.3d 1056, 1068 (D.C.Cir.2001).
III.
For the foregoing reasons, I am convinced that the Board provided neither a reasonable explanation nor one based on substantial record evidence to support its conclusion that Federated committed an unfair labor practice by threatening futility if unionization took place. The same goes for the three “extraordinary” remedies it imposed. Because the majority has done no better today in upholding the Board on these two matters, I respectfully dissent from sections II.A and II.D of the majority opinion.

. While the majority does not mention manager Jody Beachy's statement to one employee (Kathy Lee Gay) that wages would remain constant during negotiations with the Union, see Federated Logistics & Operations, 340 NLRB No. 36, slip op. at 1 (2003), reprinted in Joint Appendix (J.A.) 1; see also J.A. 347, I believe that the Board failed to evaluate this statement in the context of Federated's pronouncement in early October that, while wages and benefits would be "frozen'' during negotiations, it nevertheless would continue to make " 'routine' past practice changes such as normal merit reviews," J.A. 60. See discussion infra at 933.

. Federated distributed a communication on October 2 — the day of the first employee meeting — asking its employees to consider whether they "could ... possibly get hurt from ‘give and take' bargaining?” J.A. 59. The next day, October 3, Federated distributed a communication stating that "if the union wins your vote, then wages and benefits become subject to 'give and take' bargaining.” J.A. 60. The day of the second employee meeting, October 4, Federated distributed a communication stating that "[u]nionization means that the ‘give and take' of bargaining will decide whatever happens,” J.A. 61, and followed up the next day with a communication stating, "You can avoid the risks of 'give and take’ bargaining ....” J.A. 63. The election was not held until October 6. Federated Logistics & Operations, 340 NLRB No. 36, slip op. at 1.

. Given that the Board was obligated to consider the statements in context, see discussion supra at 932-33, I find the majority's pondering whether the Board was "correct in doing so (and whether we should adopt the Fifth Circuit's totality-of-the-circumstances test)[]” beside the point. See Maj. Op. at 926.

. See, e.g., J.A. 43 ("Bargaining is 'give and take' which means that you could get more, the same, or less. No one can predict what you may get or lose with unionism.”) (emphasis added); J.A. 46 (". 'Collective bargaining' involves 'give and take.’ Both union and management must bargain in good faith ....”); J.A. 56 (if Union were to win, "the only thing it 'wins' is the right to participate in 'give and take' bargaining”) J.A. 57 ("[f]he 'give and take' bargaining process can bring risks, as well as rewards.”); see also infra note 5.

. See J.A. 41-63 (written communications to employees); J.A. 88-106 (PowerPoint presentation); see also discussion supra note 4. In its information campaign, Federated consistently stressed that it intended to respect its employees' views on unionization, see J.A. 41, 42, 43, 46, 48, 49, 55, 57, 60, 63, 89, 92, 103, 105, 106, and that, if the Union won, bargaining would be "give and take,” J.A. 43, 46, 48, 56, 59, 60, 61-63, 94, 100, and pursued in good faith, see J.A. 46, 56, 57, 95, and that it would not take retaliatory action, see J.A. 55, 56, 57, 62.

. See, e.g., Audubon Regional Med. Ctr., 331 NLRB 374 (2000) (extraordinary remedies to lessen effects of employer's (1) discriminatory rule enforcement; (2) threats to close plant, cut jobs and benefits, discriminate and discipline; (3) refusal to negotiate with union; (4) attempts to discourage union support by announcing wage increases and new benefits; and (5) discrimination against employees); Fieldcrest Cannon, Inc., 318 NLRB 470, 473-474 (1995), enfd., 97 F.3d 65, 73 (4th Cir.1996) (employer "adopted a scorched earth, take-no-prisoners approach”).